ESTATE OF BERT L. FUCHS, DECEASED, THE OMAHA NATIONAL BANK, CO-ADMINISTRATOR, PEARL J. FUCHS, CO-ADMINISTRATRIX, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 558–65. Filed November 23, 1966.

*Marvin G. Schmid*, for the petitioner.
*Ronald M. Frykberg*, for the respondent.

FAY, *Judge:* Respondent determined a deficiency in estate tax in the amount of $17,734.53.

Petitioner has not raised issue with respect to certain items in respondent's notice of deficiency. The issue for decision is whether respondent erred in including in the gross estate of Bert L. Fuchs the amount of $100,000, which represented the combined proceeds of two policies of accident insurance paid to two beneficiaries named in the policies, after his death.

### FINDINGS OF FACT

Some of the facts are stipulated and as stipulated are so found.

Bert L. Fuchs (hereinafter referred to as decedent) died intestate on September 2, 1960.

The Omaha National Bank and Pearl J. Fuchs—decedent's widow (hereinafter referred to as Pearl)—are the duly appointed, qualified, and acting coadministrator and coadministratrix, respectively, of decedent's estate. A Federal estate tax return for decedent's estate was filed with the district director of internal revenue, Omaha, Nebr.

Prior to September 2, 1960, decedent, Pearl, John J. Fuchs (hereinafter referred to as John), and Forrest L. Pflasterer hereinafter referred to as Forrest) were partners who owned and operated a mill supplies and machine tool business in Omaha under the partnership name of Fuchs Machinery & Supply Co. (hereinafter referred to as the company). Hereinafter reference to the partners will refer solely to decedent, John, and Forrest.

In or about 1951 the partners entered into an oral agreement which provided that in the event of any partner's death, the remaining partners would purchase the deceased partner's interest in the company. The partners decided to fund the partnership purchase agreement by means of insurance. This agreement will hereinafter be referred to as the partners' agreement.

In 1953 John and Forrest each purchased a life insurance policy from Northwestern Mutual Insurance Co. of Milwaukee, Wis. (hereinafter referred to as Northwestern), on decedent's life in the respective amounts of $33,000 and $17,000 as a means of funding the aforesaid agreement. Paul Miller, Jr. (hereinafter referred to as Miller), who represented Northwestern, acted as their agent. John and Forrest considered that the amounts of the Northwestern policies were minor and that they would increase their insurance coverage as soon as they were financially able. The policies specifically provided that the respective beneficiaries were the sole owners thereof. Each policy was paid for by and remained in the possession of the respective beneficiaries.

Other pertinent provisions of the Northwestern policies stated as follows:

Control of said policy shall be as follows, and the present control provisions shall be amended accordingly:

Before said policy becomes payable, the power to exercise all policy rights and privileges and to change or revoke any provision of this form is hereby vested solely in John J. Fuchs. In the event of the death of John J. Fuchs, any remainder of said power shall be vested solely in Mildred F. Fuchs; in the event of the death of John J. and Mildred F. Fuchs, any remainder of said power shall be vested solely in the executors, administrators or assigns of the survivor of them. All policy provisions inconsistent herewith are suspended.

Because their business operation required frequent travel, the partners realized the desirability of having comprehensive accident insurance coverage on an annual basis.[1] Consequently, in 1954 John met with Miller and discussed the possibility of obtaining accident insurance as an additional means of funding the buy-sell agreement. Miller recommended the purchase of policies from the Continental Casualty Insurance Co. of Chicago, Ill. (hereinafter referred to as Continental Casualty).

On September 7, 1954, the decedent made application to Continental Casualty for an accidental death insurance policy naming John the beneficiary. Pursuant to said application Continental Casualty issued policy No. SRD-251860 (hereinafter referred to as the Fuchs policy) in the amount of $65,000.

---

[1] They discussed their desire for accidental death insurance coverage among themselves and in the presence of Miller and Leonard A. Nelson, their accountant. During these discussions they noted their intentions that the beneficiaries own any prospective policies.

On September 7, 1954, John made application to Continental Casualty for an accidental death insurance policy naming decedent the beneficiary. Pursuant to said application Continental Casualty issued policy No. SRD–251859 in the amount of $50,000.

On September 7, 1954, decedent applied to Continental Casualty for an accidental death insurance policy naming Forrest as beneficiary. Pursuant to said application, Continental Casualty issued policy No. SRD–251858 (hereinafter referred to as the Pflasterer policy) in the amount of $35,000.

The policy amounts decided upon were related to the partners' percentage interests in the company.

Miller wrote the aforesaid policies as a broker agent through Continental Casualty. Miller had been instructed by the partners that the Continental Casualty policies were to be issued in the same manner as the Northwestern Mutual policies—that is, the beneficiary of each policy was to be the owner thereof, pay the premiums, and collect the proceeds. The Continental Casualty policies were intended to supplement John's and Forrest's Northwestern policies. However, Miller failed to draw up the policies so as to reflect the partners' intentions.

Miller delivered each policy to the respective beneficiaries. Upon receiving the Continental Casualty policies, John and Forrest gave said policies to the company bookkeeper and instructed her to place them in the company safe. They told her that each partner owned that policy whereupon his name appeared as beneficiary. Each policy was kept in a separate envelope which bore the name of the partner who was beneficiary of the policy contained therein. The policies remained in a safe in the company's office until decedent's death.

All three policies were similar in wording. Pertinent provisions of each policy provided as follows:

### Part III

11. Indemnity for loss of life of the Insured is payable to the beneficiary if surviving the Insured, and otherwise to the estate of the Insured. All other indemnities of this policy are payable to the Insured.

12. If the Insured shall at any time change his occupation to one classified by the Company as less hazardous than that stated in the policy, the Company upon written request of the Insured and surrender of the policy, will cancel the same and return to the Insured the unearned premium.

13. Consent of the beneficiary shall not be requisite to surrender or assignment of this policy, or to change of beneficiary, or to any other changes in the policy.

\*     \*     \*     \*     \*     \*     \*

16. The Company may cancel this policy at any time by written notice delivered to the Insured or mailed to his last address, as shown by the records of the Company, together with cash or the Company's check for the unearned portion of the premiums actually paid by the Insured, and such cancellation shall be without prejudice to any claim originating prior thereto.

The second sentence of the first paragraph of Part IV of each policy provided: "Any premium paid to the Company for any period not covered by this policy will be returned to the Insured."

Premium notices addressed to the respective applicants of each policy were mailed to the company. The premiums for each of the policies were paid annually by one check written on the company's account for the total of the premiums. The premiums for each individual policy were charged to the partnership withdrawal account of that partner whose name appeared on the policy as beneficiary. At the end of each partnership year the balance of each withdrawal account of Forrest, John, and decedent was closed by a credit entry to the respective drawing account and a debit entry to their respective investment accounts.

John and Forrest first learned that the Continental Casualty policies had been billed to the insured rather than to the beneficiaries after respondent's notice of deficiency herein was sent to petitioner.

Subsequent to decedent's death, the insurance proceeds provided for in the Pflasterer policy were paid to Forrest and those provided for in the Fuchs policy were paid to John.

During 1960 policy No. SRD–251859, which had been applied for by John, the insured thereunder, was canceled. A check dated December 27, 1960, for the purpose of refunding the unearned premium was sent to John. John immediately remitted said check to petitioner.

Pursuant to the buy-sell agreement, John and Forrest purchased decedent's and Pearl's partnership interest in the company from decedent's estate within approximately 3 months of decedent's death, using the Continental Casualty insurance proceeds to fund such purchase.

In his notice of deficiency respondent determined, *inter alia*, that the proceeds of the Fuchs and Pflasterer policies were includable in decedent's gross estate (1) under the provisions of section 2042 of the Internal Revenue Code of 1954 since decedent had incidents of ownership with respect to those policies within the meaning of that section and (2) under section 2033 since decedent had interests in the policies at the time of his death.[2]

#### ULTIMATE FINDINGS OF FACT

The purpose of the insurance policies in issue was to fund an oral buy-sell agreement between decedent, John, and Forrest.

It was the agreement and understanding of the partners that all insurance policies purchased by them on each other's lives would be owned by the respective beneficiaries, with all rights, title, and interest in the owner-beneficiary, and with no interest, privilege, or rights in the insured.

---

[2] Respondent abandoned his second or alternative argument on brief.

OPINION

The issue arises from the following facts. The insurance policies involved herein were accidental death insurance policies taken out in 1954 with Continental Casualty. The purpose of the foregoing policies, as well as the Northwestern policies taken out in 1953, was to fund an oral buy-sell agreement between the partners. It was the agreement, belief, and understanding of the partners that each insurance policy would be owned by its respective beneficiary and that no right, title, or privilege therein was to rest with the insured. Contrary to the explicit instructions given by the partners to their insurance agent, the policies failed to reflect specifically or otherwise the partners' directions and intentions, to wit, that the respective beneficiary was to own the policy on which he was so named. The beneficiary of each policy paid all the premiums thereon through his partnership account. Since the company's bookkeeper handled the insurance policies, the partners were unaware that a discrepancy existed between their intentions and the face of the policies.

Section 2042(2)[3] provides, *inter alia*, that the value of the gross estate shall include

the amount receivable by all other beneficiaries as insurance under policies on the life of the decedent [4] with respect to which the decedent possessed at his death any of the incidents of ownership, exercisable either alone or in conjunction with any other person. * * *

The issue for decision is therefore whether decedent possessed at his death any "incidents of ownership" with respect to the Fuchs and Pflasterer policies.

Respondent's argument may be summarized as follows: Decedent applied for and was issued two accident insurance policies on his life—the Fuchs and the Pflasterer policies; under the policies decedent allegedly held certain contractual powers, including, *inter alia*, (a) power to surrender or assign the policies, and (b) power to change the beneficiaries without their consent; each of these alleged contractual powers constituted an "incident of ownership" possessed by decedent within the meaning of section 2042(2). Accordingly, respondent concludes, the amounts received by the designated beneficiaries in accordance with the Fuchs and the Pflasterer policies were includable in decedent's gross estate.

Petitioner contends that the Fuchs and Pflasterer policies were owned by the respective beneficiaries who, rather than decedent, had the incidents of ownership with respect to those policies.

---

[3] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

[4] It has been settled by the Supreme Court in *Commissioner* v. *Noel Estate*, 380 U.S. 678 (1965), that accidental death insurance policies constitute insurance taken out on the life of the decedent within the scope of sec. 2042(2).

The partners' agreement with respect to the Continental Casualty policies created an informal relationship of a quasi-trust nature which obligated the partners to deal with each policy in a manner conforming to the terms of the agreement. Assuming, *arguendo*, that the insured of each policy herein possessed the naked power to change beneficiaries or make an assignment, we cannot say, in view of the partners' agreement regarding the policies, that the insured herein should be treated in any way differently than a common trustee. Each insured herein was under no less of a legal duty to respect the terms of the partners' agreement than a common trustee legally obligated to respect the terms of a trust indenture. Decedent merely had the same type of power over the Fuchs and Pflasterer policies as a trustee's power to affect trust proceeds. We do not believe that this type of naked power alone is sufficient to bring the insurance proceeds within decedent's gross estate.

Respondent relies upon *Commissioner* v. *Noel Estate*, 380 U.S. 678 (1965). There two airline flight insurance policies were purchased on decedent's life, reserving to the decedent the rights of assignment and change of beneficiary. Upon decedent's instructions, the insurance salesman handed the policies to decedent's wife. Among other things, petitioner therein argued that decedent did not have the incidents of ownership with respect to the two policies in issue on the grounds (1) that decedent's widow purchased the policies and therefore owned them and (2) that even if decedent owned the policies, he gave them to her, thereby depriving himself of power to assign the policies or to change the beneficiary.

In *Estate of Marshal L. Noel*, 39 T.C. 466 (1962), revd. 332 F. 2d 950 (C.A. 3, 1964), revd. 380 U.S. 678 (1965), the Tax Court, as trier of the facts, made no finding that the beneficiary paid for the policy in issue with the intention that she own it. See *Commissioner* v. *Noel Estate*, 380 U.S. at 683. Moreover, the Tax Court also stated that "the delivery of the policies to [the beneficiary] in such circumstances hardly establishes an assignment" and that it was "not convinced that petitioner intended to part with all rights in the policies." It went on to say:

the testimony, even if strictly accurate, suggests merely that the decedent was indulging in a common practice of giving physical possession of the policies to the beneficiary so that, in the event of a fatal accident, she would be in a position to assert her rights under the policies. * * *

The Supreme Court's decision in *Noel Estate* was not based upon decedent's mere power to assign the insurance policies in question or change the beneficiaries named thereon, but upon his unlimited and unrestricted right to do so as well. The Supreme Court specifically states that the Tax Court did not find that decedent's wife bought and

owned the policies in question. In the instant case the existence of the partners' agreement established in John and Forrest an irrevocable right vis-a-vis decedent that they remain the beneficiaries of and obtain any economic benefit from the Fuchs and Pflasterer policies, respectively. The rights possessed by John and Forrest were not meaningless but required decedent to deal with the policies in terms of the partners' agreement.

The instant case comes within the exception mentioned in *United States* v. *Rhode Island Hospital Trust Co.*, 355 F. 2d 7 (C.A. 1, 1966),[5] to the rule articulated therein, to wit:

> To the principle of the heavy predominance of the "policy facts" over the "intent facts" there must be added the caveat that, where the insurance contract itself does not reflect the instructions of the parties, as where an agent, on his own initiative, inserts a reservation of right to change a beneficiary contrary to the intentions which had been expressed to him, no incidents of ownership are thereby created. National Metropolitan Bank of Washington v. United States (1950), 87 F. Supp. 773, 115 Ct. Cl. 396; Schongalla v. Hickey, 2 Cir. 1945, 149 F. 2d 687.

The court went on to state:

> The case before us presents no such issue, for the right in decedent to change beneficiaries was recognized on the one occasion when it was exercised and this right continued thereafter.

This exception was also recognized by the Tax Court in *Estate of Marshal L. Noel, supra* at 471 fn. 1, wherein it is stated:

> This is not a case of erroneous provisions in the policies or the inclusion of provisions which resulted from unauthorized action by an insurance agent, which might have been corrected by reformation of the policies after they were issued. Cf. *Schongalla* v. *Hickey*, 149 F. 2d 687 (C.A. 2), and *National Metropolitan Bank* v. *United States*, 87 F. Supp. 773 (Ct. Cl.), relied upon by petitioner.

The Supreme Court, in affirming the Tax Court, did not comment on the exception noted by the Tax Court. However, as mentioned above, the First Circuit in *Rhode Island Hospital Trust Co.* explicitly approved of the above-described exception, although it went a great deal further than the Supreme Court in *Noel Estate* to bring the insurance policy before it within the scope of section 2042(2).

In the case before us, Miller (the partners' insurance agent), failed to effectuate the partners' explicit directions and intentions and, consequently, the Continental Casualty policies similarly failed to reflect clearly those directions and intentions. We cannot see any distinction

---

[5] In *United States* v. *Rhode Island Hospital Trust Co.*, 355 F. 2d 7 (C.A. 1, 1966), an insurance policy was taken out on decedent's life by his father 34 years prior to decedent's death and naming decedent's father and mother as beneficiaries. Decedent's father kept the policy in his own safe deposit box and paid all the premiums thereon. The father regarded the policy as belonging to him and not to his son. On the death of decedent's mother, decedent's father directed him to change the policy beneficiary, which decedent did. The First Circuit held that decedent had the necessary incidents of ownership over the insurance policy in issue so as to bring the proceeds into his gross estate under sec 2042(2).

between the situation where an agent gratuitously adds an unwanted clause in an insurance policy and the situation presented herein where the agent fails to include a desired provision or remove an undesired one. We have no doubt that had the partners been aware of their agent's error in failing to have the insurance policies reflect their wishes, the policies could have been corrected by reformation. We believe that the First Circuit would recognize the particular facts of the instant case as presenting the proper circumstances in which to apply its approved exception to the rule of *Rhode Island Hospital Trust Co., supra.*

Section 20.2042-1(c)(2), Estate Tax Regs., further states: "Generally speaking, the term ["incidents of ownership"] has reference to the right of the insured or his estate to the economic benefits of the policy. * * * " Here, decedent had no right to any economic benefits flowing from the policies. The partners' agreement prohibited decedent from using or disposing of the Fuchs or Pflasterer policies as to receive economic benefit therefrom *or to procure any other satisfactions which are of economic worth.* Section 20.2042-1(c)(2), Estate Tax Regs., goes on to list illustrative incidents of ownership or powers referred to by Congress in its reports. Although all of these powers may not necessarily enrich decedent's gross estate, we believe that Congress was only referring to those which would enable decedent to obtain some satisfaction of an economic worth.

If decedent had acted to violate the terms of the partners' agreement by changing the beneficiary on the Fuchs or Pflasterer policies, John or Forrest would have had a valid claim against decedent's estate which would have reduced the gross estate by an equivalent amount. Sec. 2053(c)(2); sec. 20.2053-4, Estate Tax Regs. Thus, if decedent had exercised any of his so-called incidents of ownership, his estate would be liable to John or Forrest for the amount of the insurance proceeds, which liability would, in turn, reduce his gross estate.

Also supporting petitioner is a large volume of case law which may be summed up by the following language:

An insured who retains the right to change the beneficiary may do so at pleasure. * * * But a court of equity will not permit a change in favor of a donee that will prejudice the rights of a person whom he has made beneficiary in accordance with a contract to that effect, for which he has received a valuable consideration, for thereby the rights of the beneficiary become vested. * * *

*MacDonald* v. *Conservative Life Ins. Co.,* 292 Mich. 182, 290 N.W. 372 (1940). See also *Reliance Life Ins. Co. of Pittsburgh* v. *Jaffe,* 121 Cal. App. 2d 241, 263 P. 2d 82 (1953); *Lee* v. *Preiss,* 18 Wis. 2d 109, 118 N.W. 2d 104 (1962); *Stolar* v. *Turner,* 237 Iowa 593, 21 N.W. 2d 544, 550 (1946); and Couch, Insurance, sec. 27: 64, p. 571 (2d ed.).

For the reasons stated above, we hold for petitioner.

*Decision will be entered under Rule 50.*