KEITH L. DOING AND MARTHA J. DOING, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5237–69.  Filed April 25, 1972.

*James A. Ryan*, for the petitioners.
*Charles H. Powers*, for the respondent.

HOYT, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income tax in the amount of $519.26 for the calendar year 1966 and $98 for the calendar year 1967. The issues presented are: (1) Whether petitioner Keith L. Doing received a premature distribution in 1966 from a self-employment retirement plan within the meaning of section 72(m)(5)(A)(i)[1] so as to render the petitioners liable for the tax imposed by section 72(m)(5)(C); and if so, (2) whether petitioners' deduction for contributions in 1967 to a self-employment retirement plan is prohibited by the provisions of section 401(d)(5)(C). Respondent has conceded that petitioners' deduction for contributions made by petitioner in 1966 to his self-employment retirement plan, disallowed by the statutory notice, is allowable.

### FINDINGS OF FACT

Some of the facts have been stipulated and such facts and the stipulated exhibits are incorporated herein by this reference. The petition-

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.

ers, Keith L. Doing and Martha J. Doing, are husband and wife. Their legal residence when they filed their petition with this Court was Casper, Wyo. Martha J. Doing is a party herein solely because she filed joint income tax returns with her husband for the years before us. Keith L. Doing will hereinafter sometimes be referred to as petitioner. The petitioners timely filed joint Federal income tax returns for the taxable years 1966 and 1967. During the taxable years 1966 and 1967, petitioners filed their returns and maintained their books and records on the cash method of accounting.

*Issue 1. Premature Distribution from Self-Employment Retirement Plan as Imposing Tax under Section 72(m)(5)(A)(i) and Section 72(m)(5)(C)*

Petitioner Keith L. Doing is a veterinarian and engaged in the practice of veterinary medicine for a period of 16 years prior to the date of the petition, which business during the years in issue was conducted as a partnership under the name of "Animal Clinic."

In 1964, petitioner, with the advice of his investment counselor, decided to adopt a self-employment retirement plan. At that time the investment counselor was associated with Financial Industrial Fund, Inc. (hereinafter sometimes referred to as FIF).

On December 9, 1964, petitioner executed and filed an Application to Establish Retirement Plan for Self-Employed Individuals with FIF, which was to be administered through the First National Bank of Denver, Denver, Colo. (hereinafter sometimes referred to as First National), as custodian, such plan to be maintained as a profit-sharing plan. The application was accepted by First National as custodian on December 31, 1964.[2] First National is a bank qualified to act as a custodian within the meaning of section 401. The parties agree, solely for the purpose of litigating the issues presented in this case, that the self-employment retirement plan of FIF as executed by petitioner met the requirements of section 401, but that this stipulation is not binding on the parties for any other purposes whatsoever.

The plan and custody agreement provided, *inter alia*, that the contributions of the employer were to be invested in shares of Financial Industrial Fund, Inc., or Financial Industrial Income Fund, Inc., as specified by the employer, with dividends and capital gains distributions allocated to a participant's account used to purchase additional shares.

Relevant provisions of the petitioner's FIF plan included the following:

---

[2] This date is at variance with the date shown on the acceptance, Dec. 31, 1963. However, the parties agree by stipulation that the application was accepted on Dec. 31, 1964.

## Article IV

Section 4.5. * * * No Participant shall have any obligation to make any contribution, but any contribution which is so made (together with earnings attributable thereto, in the case of a profit-sharing plan but not in the case of a pension plan) may be withdrawn at any time by any Participant, *other than an owner-employee, who may not make any withdrawals until after attaining age 59½, except in case of prior disability.*

\*  \*  \*  \*  \*  \*  \*

## Article V

Section 5.2. The amount of each contribution credited to a Participant's account shall be applied by the Custodian as promptly as practical to the purchase of shares or investment plans of Financial Industrial Fund, Inc. or Financial Industrial *Income* Fund, Inc., as specified by the Employer, so long as the named Funds are and remain regulated investment companies under the provisions of the Federal Internal Revenue Code.

\*  \*  \*  \*  \*  \*  \*

## Article VII

Section 7.1. The amount credited to the account of each Participant who is, or has been, an owner-employee shall be distributed to him commencing on the date on which he attains age 70½ unless the employer shall designate an earlier commencement date, *after the owner-employee attains age 59½, but not earlier than the year in which the owner-employee retires.*

\*  \*  \*  \*  \*  \*  \*

Section 7.5. When the account of any Participant or former Participant becomes distributable under the above provisions, the Employer shall furnish to the Custodian in writing all of the necessary information to enable the Custodian to make such distribution. Such distribution shall then be made in any one or combination of the following methods as directed by the Employer; provided, however, that upon the death of a Participant his account shall be distributed by such of the following methods as he shall have designated pursuant to the provisions of Section 6.1, provided, *further, that if the Employer directs the Custodian to make a distribution in a lump sum pursuant to (a) below, then the Custodian shall not in the case of an owner-employee make such distribution until the taxable year succeeding the taxable year in which such direction was given to the Custodian,* but in no event and in no case shall commencement of distribution be deferred beyond the last day of the taxable year in which the owner-employee attains age 70½.

(a) In one distribution in cash or in kind.

\*  \*  \*  \*  \*  \*  \*

## Article IX

Section 9.3. The Custodian, in addition, shall have all the powers necessary or advisable to carry out the Plan and all inherent, implied and statutory powers now or hereafter provided by law, including specifically the power to do any of the following:

(a) To cause any securities or other property to be registered and held in its name as Custodian or in the name of one or more of its nominees, without disclosing the fiduciary capacity.

(b) To distribute assets of the account or of any separate Participant's account, either in cash or in kind.

\*   \*   \*   \*   \*   \*   \*

## ARTICLE XIII

Section 13.1. The Custodian may resign at any time upon thirty (30) days' notice in writing to the Employer, and may be removed by the Employer at any time upon thirty (30) days' notice in writing to the Custodian. Upon such resignation or removal, the Employer shall appoint a successor Custodian, which successor shall be a "bank" as defined in Section 401(d)(1) of the Internal Revenue Code and, if the Plan is subject to the provisions of the California Retirement Systems Law, shall also be a bank meeting the requirements of Section 28103 of said Law. Upon receipt by the Custodian of written acceptance of such appointment by the successor Custodian, the Custodian shall transfer and pay over to such successor Custodian the assets of the custodial account and all records or copies thereof necessary for the continuation of the custodial account by the successor Custodian. The Custodian is authorized, however, to reserve such sum of money as it may deem advisable for payment of all its fees, compensation, costs and expenses, or for payment of any other liabilities, constituting a proper charge on or against the assets of the custodial account, with any balance of such reserve remaining after the payment of all such items to be paid over promptly to the successor Custodian. The Custodian shall have a lien on the assets of the custodial account to the extent of any such charges. The successor Custodian shall hold the assets paid over to it under terms similar to those of this Agreement that qualify under Section 401(f) of the Internal Revenue Code.

If within thirty (30) days after the Custodian's resignation or removal the Employer has not appointed a successor Custodian which has accepted such appointment, the Custodian shall, unless it elects to terminate the custodial account pursuant to Section 15.2 hereof, appoint such successor itself.

## ARTICLE XIV

Section 14.1. *The Employer may modify, amend, or terminate this Plan and Agreement at any time and from time to time in whole or in part* (including retroactive amendments if necessary to comply which [*sic*] rules and regulations issued by the Internal Revenue Service, or amendments necessary to comply with statutory changes) *by notice in writing to the Custodian, provided, however, that no such amendment shall cause or permit any part of the assets of the account to be used for or diverted to purposes other than the exclusive benefit of the Participants.*

Section 14.2. In addition, the Employer hereby delegates to the sponsor, Financial Industrial Fund, Inc., the authority to amend this Plan and Agreement at any time and from time to time in the same manner and with the same effect as provided in Section 14.1 above, and the Employer hereby consents to any such amendment.

## ARTICLE XV

Section 15.1. The Employer has established the Plan with a bona fide intention and expectation that from year to year it will be able to and will deem it advisable to make its contributions as herein provided. However, the Employer realizes that circumstances beyond its control may make it either impossible or inadvisable to continue to make its contributions as herein provided. *In the*

*event the Employer decides it is impossible or inadvisable to continue to make its contributions as herein provided, the Employer shall have the power to terminate the Plan by written notice to the Custodian and each Participant.* After the date specified in such notice, the Employer shall make no further contributions under the Plan. *However, the custodial account shall remain in existence, and all of the provisions of this agreement shall remain in force, other than the provisions relating to the Employer contributions. All of the assets of the account on hand on the date specified in such notice shall be held, administered and distributed by the Custodian in the manner provided in this agreement except that the Custodian may at the direction of the Employer, at any time after the date of such notice, distribute the interest of any Participant, in any manner set forth in Section 7.5, subject to the limitations of Section 7.1 or Section 7.2 with respect to distributions to a Participant who was, at any time an owner-employee.*

Section 15.2. The Custodian may elect to terminate the custodial account if within thirty (30) days after its resignation or removal pursuant to Section 13.1 the Employer has not appointed a successor Custodian which has accepted such appointment. The Custodian shall terminate the custodial account upon receiving notice of the Employer's death if the Employer is a sole proprietorship, or upon receiving notice of the termination of the partnership, if the Employer is a partnership, unless in either such case provision is made by a successor to the business of the Employer for the continuation of the Plan and the provisions hereof upon terms satisfactory to the Custodian. Termination of the custodial account shall be effected by distributing all assets thereof to the Participants and their Beneficiaries pursuant to the direction of the Employer as on the termination of the Plan. In the absence of such direction the Custodian at its option shall either distribute to each Participant and the Beneficiary of any deceased Participant the full number of shares credited to such Participant's account, pursuant to Article V hereof, together with the cash proceeds of any related fractional shares or may continue the custodial account for the benefit of any Participant or Beneficiary entitled to receive a distribution pursuant to Section 7.5 hereof. Upon the completion of such distribution, the Custodian shall be relieved from all further liability with respect to all amounts so paid.

*　　　*　　　*　　　*　　　*　　　*　　　*

ARTICLE XVI

Section 16.2. No part of the income or corpus of the account shall be used for, or diverted to, any purposes other than for the exclusive benefit of the Participants and their beneficiaries.

Section 16.3. The benefits provided hereunder shall not be subject to alienation, assignment, garnishment, attachment, execution or levy of any kind, and any attempt to cause such benefits to be so subjected shall not be recognized, except to such extent as may be required by law.

[Emphasis added.]

Following the establishment of the FIF plan, contributions were made by petitioner under the said plan on a monthly basis until 1966.

Subsequent to the adoption of the FIF plan by petitioner, his investment counselor left FIF and became associated with a newly formed mutual fund brokerage firm in Denver, Colo., as its Casper, Wyo., representative.

Prior to March 24, 1966, petitioner reviewed his investments, including the FIF plan, with his adviser. They agreed that petitioner's invest-

ment might be better off in another plan rather than with FIF. Petitioner wanted to change the plan to another fund for investment. His counselor recommended that petitioner's self-employment retirement plan be changed from FIF to another investment medium, the Keystone Co. of Boston, Boston, Mass. (hereinafter sometimes referred to as Keystone). To this end, discussions were held with an attorney for Keystone, who reviewed all new plans that were being instituted with Keystone.

Petitioner was aware of the fact that for tax reasons he should not terminate his existing plan; he had no desire to terminate it but only wanted to change or amend it to provide for more favorable investment prospects.

On March 24, 1966, petitioner executed the Facing Page of Plan and Application to Custodian, New England Merchants National Bank of Boston, Boston, Mass. (hereinafter sometimes referred to as New England Merchants), to establish a Keystone Custodian Funds Self-Employed Individuals Tax Retirement Plan, which included and incorporated a profit-sharing plan. This application was turned over to petitioner's investment counselor in Casper.

Several weeks later, on April 21, 1966, petitioner executed an Application and Dividend Reinvestment Order under the "Keystone Open Account Plan," which was also submitted to his investment adviser.

On that same date, April 21, 1966, petitioner by letter requested First National of Denver to take certain action with respect to his existing account maintained under the FIF plan. The letter stated as follows:

April 21, 1966

FIRST NATIONAL BANK OF DENVER
*Box 5808*
*Terminal Annex*
*Denver, Colo. 80217*

DEAR SIRS:

It is my desire to make a change in my self employment retirement program.

Please liquidate the shares in this plan and send the monies to The Keystone Company of Boston, 50 Congress St., Boston, Mass. 02109. Attn: Company Attorney.

The plan number is listed below:
Keith L. Doing
Acct. # AO–60214
Thank you very much for your help.
Sincerely,

(S) KEITH L. DOING

Approximately 1 week later, on April 27, 1966, petitioner's Facing Page of the New Plan and Application for Custodian, dated March 24, 1966, and the Open Account Application and Dividend Reinvestment Order, dated April 21, 1966, were sent by petitioner's adviser in Casper to his Denver office. In the letter of transmittal, the Denver mutual fund

brokerage firm was advised that petitioner had written to First National to have his shares in the FIF plan liquidated and the resulting money forwarded to Keystone, attention of its attorney. It was further stated that the amount of the initial investment in Keystone would be approximately $2,600, depending upon the liquidating value of the FIF shares.

On May 3, 1966, the Denver broker forwarded the above documents, along with a copy of the transmittal letter of April 27, 1966, to the attorney for Keystone in Boston. It was explained that the money for the plan would be forwarded to Keystone directly from First National.

However, without further communication with petitioner and ignoring his instructions, First National forwarded to petitioner by letter on May 13, 1966, a check in the amount of $2,438.18, payable to petitioner, which letter and check were received by petitioner in due course through the mails. Making distribution to petitioner was not only in violation of petitioner's request and direction, but also was in violation of the custody agreement between petitioner and the custodian. First National erred in sending the check to petitioner.

The letter of transmittal from First National to petitioner read as follows:

May 13, 1966

DEAR MR. DOING:

Enclosed is our check in the amount of $2,438.18 which represents the redemption proceeds from Financial Program, Inc., less our termination fee of $5.00.

In regard to your request to have the proceeds sent to the Keystone Co., we are required to make our check payable to you as the participant payee, thus necessitating your endorsement for further redeposit. In addition, there are certain tax implications associated with this redemption which you may want to have your tax advisor look into.

Very truly yours,

(S) R N B
*Assistant Trust Officer*
[First National Bank of Denver]

Upon receipt of this letter, with the enclosed check, petitioner realized that this was not in accordance with his request or what he considered the proper procedure necessary for changing his plan and maintaining favorable tax treatment with respect to his self-employment retirement program. Petitioner immediately called his investment adviser and explained the situation. The counselor advised petitioner to come to his office to discuss what should be done. They met and decided that the check should be sent to Keystone. Petitioner then endorsed the check and turned it over to his adviser so that he could forward it to his Denver brokerage office, the same procedure that was previously followed with respect to correspondence between petitioner and Keystone. This was done.

On May 23, 1966, the Denver broker forwarded the check to the

attorney for Keystone with a transmittal letter, which read in part as follows:

May 23, 1966

Enclosed is a First National Bank of Denver check in the amount of $2438.18 (#T074642) made payable to Keith L. Doing and endorsed to the Keystone Company of Boston.

After talking with you on the phone Friday, we received this check along with the note from Gordon McManus indicating that the check had to be made payable to the investor and this is what caused the delay in forwarding it to you.

I trust that this will take care of all the problems involving this account. If not, please drop me a line and let me know.

Sincerely,

W. H. MEIERS, JR.
*Treasurer*

On May 26, 1966, New England Merchants executed an acceptance of its appointment as custodian in accordance with the custody agreement, effective on March 24, 1966. New England Merchants is a bank qualified to act as a custodian within the meaning of section 401. The Keystone Co. of Boston is not a bank or trust company and does not qualify "as a custodian" within the meaning of section 401. The parties agree solely for the purpose of litigating the issues presented in this case that the self-employment retirement plan of Keystone as executed by petitioner met the requirements of section 401, but that this stipulation is not binding on the parties for any other purposes whatsoever.

Petitioner's Keystone plan, under custodial account with New England Merchants, included the following provision:

ARTICLE V—CUSTODIAL ACCOUNT

All contributions under the Plan shall be paid over to a Custodial Account to be maintained by the Employer with a Custodian qualifying as a bank under § 401(d)(1) of the Internal Revenue Code. The Custody Agreement pursuant to which such Account is maintained shall provide:

(1) that the investment of all funds in such Account (including all earnings) shall be made solely in the investment designated on the Facing Page, a regulated investment company within the meaning of § 851(a) of the Internal Revenue Code of 1954, which issues only redeemable stock, and

(2) that the shareholder of record of all such assets shall be the Custodian or its nominee.

The Participants shall be the beneficial owners of all such assets held in the Custodial Account.

The Keystone plan also provided for termination by the employer but limited distribution, upon such termination, to an employer participant unless he was then 59½ years of age. If those conditions were not met, his share in the plan was to be held by the custodian until he attained age 59½ or became disabled. This provision was essentially the same as the provision in the earlier FIF plan, which limited dis-

tributions upon termination to owner-employees who attain age 59½ or are disabled.

The custody agreement with New England Merchants included the following provisions:

Section 2. Receipt of Contributions

The Custodian shall accept and hold in the Custodial Account such contributions of money, and if allowable pursuant to the terms of the Internal Revenue Code and Regulations thereunder, shares of the regulated investment company designated on the Facing Page of the Plan, on behalf of the Participants as it may receive from time to time from the Employer. All such contributions shall be accompanied by written instructions from the employer specifying the Participants' accounts to which they are to be credited. The minimum aggregate contribution which may be made at any one time shall have a value of not less than $50 for each designated Participant (except for specific contributions necessary to comply with the provisions of the Plan.)

Section 3. Investment of Account Assets

The amount of each contribution credited to a Participant's Account shall be applied to the purchase of shares of the said investment company, which shall be credited to such Account with notation as to cost.

    \*      \*      \*      \*      \*      \*      \*

All shares of said investment company required by the Custodian shall be registered in the name of the Custodian or of its registered nominee \* \* \*

The investment restriction designated on the Facing Page of the Plan, as referred to in the above provisions, reads as follows:

The Employer hereby appoints, as Custodian, in accordance with the Custody Agreement hereinafter set forth, the NEW ENGLAND MERCHANTS NATIONAL BANK OF BOSTON, and directs that contributions shall be fully invested in the following shares, prospectus for which has been received:

KEYSTONE CUSTODIAN FUNDS, Series   K-2   (designate one) to be held in Keystone Open Account.

On May 27, 1966, 321.396 shares of Keystone No. 2 Fund, in the amount of $2,436.18 ($2,438.18 less $2 service fee) were purchased through the Keystone Open Account Plan for petitioner's retirement plan. The purchase confirmation statement designated the account for which the shares were purchased as being a custodial account entitled as follows:

New England Merchants Natl. Bank
Cust. of Animal Clinic
Profit Sharing Retirement Plan
U/A Dated 3/24/66
A/C Keith L. Doing
2060 Fairground Rd.
Casper, Wyo. 82601

Following the liquidation of the funds from the First National custodial account, petitioner made no further contributions to the FIF plan. However, petitioner thereafter continued to make monthly payments to the Keystone plan, which totaled $600 in 1966.

It is unclear from the record as to exactly when petitioner ceased his contributions to the FIF plan, but apparently he made no such contributions in 1966. On his tax return for the calendar year 1966, petitioner listed $300 as an adjustment to income based on a self-employed retirement plan deduction. Such deduction was computed on Form 2950 SE, U.S. Treasury Department, Internal Revenue Service, which was attached to petitioner's return. The only plan indicated on that form as receiving petitioner's contributions for that year was petitioner's Keystone plan. Also attached to the return was a copy of the Facing Page and Application to Custodian of petitioner's Keystone plan and a copy of a schedule listing petitioner as the participant thereunder. There was no indication on the return as filed, or on any attached forms or schedules, that petitioner made any contributions in 1966 to any other plan, including the FIF plan.

Petitioner Keith L. Doing was not disabled and was 38 years of age as of February 8, 1966.

Respondent, in the statutory notice of deficiency dated July 17, 1969, determined that the amount received by petitioner in 1966 from the First National Bank of Denver as custodian constituted a premature distribution in liquidation of the plan with FIF which was taxable as follows:

Tax before premature distribution:

| | | |
|---|---|---|
| Taxable income per return | | $17,160.64 |
| Add: Adjustment [1] | | 300.00 |
| Taxable income before premature distribution | | 17,460.64 |
| Tax thereon | | $3,668.98 |

Tax after premature distribution:

| | | |
|---|---|---|
| Taxable income before premature distribution—above | | 17,460.64 |
| Add: Premature distribution | | |
| Proceeds received | $2,438.18 | |
| Less: Basis | 1,025.00 | 1,413.18 |
| Taxable income after premature distribution | | 18,873.82 |
| Tax thereon | | 4,064.67 |
| Tax increase due to premature distribution—1966 | | 395.69 |
| Increase in tax—sec. 72(m)(5) 110% times $395.69; to Schedule 1 | | 435.26 |

[1] 1966 deduction for contributions disallowed.

The parties have stipulated that the 1966 deduction claimed as an adjustment to gross income in the amount of $300 as payments made by a self-employed person to retirement plans arose from contributions of $600 made to the Keystone plan. Respondent has now conceded that this deduction is allowable.

The parties agree that petitioner's basis as shown in respondent's computation of the taxable portion of the distribution is not less nor more than the amount of $1,025.

### Issue 2. Disallowance of Deduction for Contributions to Self-Employment Retirement Plan

The petitioners on their income tax return for the taxable year 1967 deducted from adjusted gross income the sum of $350 as payments made by a self-employed person to retirement funds which arose from contributions of $600 made to the Keystone Custodian Funds Self-Employed Individuals Tax Retirement Plan, IRS serial No. 639507, and $200 to the First Trust Corporation Self-Employed Individuals Tax Retirement Plan, IRS serial No. 639523.

The above-described deduction for petitioner's contributions to his self-employment retirement plans for the taxable year 1967 was disallowed by the respondent in his notice of deficiency dated July 17, 1969, on the grounds that petitioner had received a premature distribution in 1966 from First National in liquidation of petitioner's self-employment retirement plan with FIF. Because of this distribution the claimed deduction for self-employment retirement contributions for 1967 was determined to be not allowable under the provisions of section 401(d)(5)(C).

#### OPINION

### Issue 1. Premature Distribution from Self-Employment Retirement Plan as Imposing Tax under Section 72(m)(5)(A)(i) and Section 72(m)(5)(C)

The first issue in this case is whether the check received by petitioner from First National constituted a distribution within the meaning of section 72(m)(5)(A)(i)[3] so as to impose the tax under section

---

[3] SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(m) SPECIAL RULES APPLICABLE TO EMPLOYEE ANNUITIES AND DISTRIBUTIONS UNDER EMPLOYEE PLANS.—

\* \* \* \* \* \* \*

(5) PENALTIES APPLICABLE TO CERTAIN AMOUNTS RECEIVED BY OWNER-EMPLOYEES.
 (A) This paragraph shall apply—
  (i) to amounts (other than any amount received by an individual in his capacity as a policyholder of an annuity, endowment, or life insurance contract which is in the nature of a dividend or similar distribution) which are received from a qualified trust described in section 401(a) or under a plan described in section 403(a) and

72(m)(5)(C).[4] These sections generally provide that amounts received from a qualified trust by an owner-employee, before such individual attains the age of 59½ years, for any reason other than his becoming disabled, shall render that individual liable for an additional tax of 110 percent of the increase in tax that would have resulted from the inclusion of such amounts in that individual's gross income for the taxable year of the distribution, to the extent that such amounts were attributable to contributions paid on behalf of said owner-employee.[5]

As will hereinafter be discussed in some detail, these statutory provisions were enacted to prevent self-employed taxpayers, who establish qualified retirement plans, from using such plans for income-averaging purposes by deducting contributions in high-income, high-tax years and withdrawing them in low-income years when little or no tax would be due. S. Rept. No. 992, 87th Cong., 1st Sess. (1961), 1962–3 C.B. 324. See also H. Rept. No. 378, 87th Cong., 1st Sess. (1961), 1962–3 C.B. 273.

The facts of record here make it entirely clear that at no time did petitioner desire or seek to terminate his retirement plan, as that term is used for Federal income tax purposes, or to withdraw the funds therefrom. He never directed, requested, or anticipated that a distribution from the FIF plan be made to him. He merely attempted, albeit in an inartistic, inept, and unsophisticated way, to change his retirement plan from one qualifying plan to another comparable qualifying plan in order to improve the quality of the plan's investments. That is all that he sought to do, and in fact, it is all that was ever actually accomplished.

Petitioner's plans, however, went awry when First National ignored his instructions. Not only did the bank fail to comply with his request to send the FIF plan funds to Keystone, but in sending the check to petitioner, it ignored and violated its custody agreement

---

which are received by an individual, who is, or has been, an owner-employee, before such individual attains the age of 59½ years, for any reason other than the individual's becoming disabled (within the meaning of paragraph (7) of this subsection), but only to the extent that such amounts are attributable to contributions paid on behalf of such individual (whether or not paid by him) while he was an owner-employee.

[4] SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(m) SPECIAL RULES APPLICABLE TO EMPLOYEE ANNUITIES AND DISTRIBUTIONS UNDER EMPLOYEE PLANS.—

\* \* \* \* \* \* \*

(5) PENALTIES APPLICABLE TO CERTAIN AMOUNTS RECEIVED BY OWNER-EMPLOYEES.

\* \* \* \* \* \* \*

(C) If subparagraph (B) does not apply to a person for the taxable year, the increase in tax of such person for the taxable year attributable to the amounts to which this paragraph applies shall be 110 percent of such increase (computed without regard to this subparagraph).

[5] See also secs. 1.72–17(e)(1)(i)(a) and 1.72–17(e)(2)(ii), Income Tax Regs.

with petitioner. This error on the part of First National is responsible for the situation in which petitioner finds himself before us.

The custody agreement expressly prohibited the bank from making distribution to petitioner upon termination of his plan with FIF. This is clear from Article XV which specified in section 15.1 that upon notice of termination by the employer, all of the assets in the account shall be held, administered, and distributed in accordance with the agreement, except as directed by the employer in any manner set forth in section 7.5, "subject to the limitations of Section 7.1 or Section 7.2 with respect to distributions to a Participant who was, at any time an owner-employee." Petitioner having been an owner-employee at all times, no distributions should have been made to him until he was over 59½ years of age or had retired or ceased to be an employee. Had the First National complied with petitioner's instructions or with the terms of its agreement with him, no question of a premature distribution would have been raised.

Be that as it may, First National mailed the check to petitioner, who immediately sent it along to the second plan, and respondent has determined a deficiency in petitioner's income tax for 1966 because the First National sent him $2,438.18 from the FIF fund. The petitioner denies that he received the distribution, relying on his instructions to First National and on the facts that it erred in sending him a check in violation thereof, and that he immediately sent it on to the second qualifying plan to be held therein in accordance with the new agreement he had already executed.

At the outset it should be noted that, except for a short paragraph in his brief suggesting that petitioner would be deemed to be in constructive receipt of a distribution under section 1.72–17(d)(1) of the regulations if his instructions to First National had been obeyed (an argument which we reject as hereinafter discussed), respondent does not argue that a premature distribution would have occurred if petitioner had terminated the FIF plan and First National had complied with his request and forwarded the funds in the initial retirement plan fund to the custodian of a qualified second fund. Indeed such an argument would be contrary to respondent's own regulations and rulings which recognize that whether a plan is terminated for tax purposes is generally to be determined with regard to all the facts and circumstances in a particular case, and that a plan is not terminated for tax purposes, for example, merely because an employer replaces that plan with a comparable plan. Sec. 1.401–6(b)(1), Income Tax Regs. See also Rev. Rul. 67–213, 1967–2 C.B. 149; Rev. Rul. 68–160, 1968–1 C.B. 167; Rev. Rul. 71–541, 1971–2 C.B. 209. The comparability of the two plans here involved is obvious from our findings of fact, and the Keystone plan replaced the earlier FIF plan.

From these rulings it is suggested that a change of the funding medium, of the trustee or custodian, or from one plan to another plan does not necessarily manifest a prohibited "distribution" under a self-employment retirement program. With that suggestion we agree. The regulations as well recognize this. Sec. 1.401–6(b)(1).

We do not consider it necessary to pursue the technical "legal obligation" arguments made by the parties, given the particular facts of this case. Respondent's revenue rulings dealing with the requirement of such a legal obligation, on which he relies here, are distinguishable from the instant case, as pointed out in petitioner's reply brief. See Rev. Rul. 55–368, 1955–1 C.B. 40; Rev. Rul. 69–254, 1969–1 C.B. 129.[6] We believe the instant case must be decided upon other grounds, without going into the technicalities urged upon us by the parties.

We find no merit in respondent's contention that under section 1.72–17(d)(1), Income Tax Regs., the request by petitioner to transfer the funds directly, had it been carried out, would have been a constructive receipt by petitioner of a premature distribution because of the assignment or pledge of his interest in the retirement plan. Petitioner's attempt to effect a direct transfer from one qualified plan to another cannot be construed or regarded as an attempt by him to assign or pledge his interest in the retirement funds. The facts of record do not support the conclusion that he assigned or pledged his interest in the FIF plan so as to call into play the operating provisions of section 1.72–17(d)(1) of the regulations, and require the conclusion that there was a constructive receipt by him of a distribution in 1966. Petitioner's request to transfer the funds directly to Keystone was merely an attempt to amend his plan to provide for a new custodian and a new investment medium, and nothing more. Had the bank complied with such request, the transfer would have qualified as a valid transfer, not operating as a premature distribution.[7]

---

[6] The facts here are quite similar to those disclosed in Rev. Rul. 55–368, 1955–1 C.B. 40, in that the plan participants previously executed and thereafter carried out an agreement to pay over distributive shares in an earlier plan to a second qualified plan. The ruling does not indicate whether or not the second plan was in fact in existence when the distributions were made to the employees. The ruling reads in part as follows:

"Advice has been requested with regard to the tax consequences of distributions from a pension trust which has been held to be qualified under section 401(a) of the Internal Revenue Code of 1954 and exempt under section 501(a) of the Code, upon discontinuance of the plan, where funds are distributed to the employee participants who in turn pay them over to the trustees of a new plan also qualified under section 401(a) of the Code.

\*   \*   \*   \*   \*   \*   \*

"It is held that the distribution of all funds of a pension trust to the employee participants, each of whom has previously executed and who thereafter carries out a legally enforceable agreement to pay over his distributive share to a new pension trust which, like the former, constitutes a qualified trust under section 401(a) of the Internal Revenue Code of 1954, is considered a transfer of funds from one such trust to another through the agency of the employees, who will realize no taxable income from such transactions. \* \* \*"

[7] Rev. Rul. 55–368, 1955–1 C.B. 40; Rev. Rul. 55–427, 1955–2 C.B. 27; Rev. Rul. 67–213, 1967–2 C.B. 149; Rev. Rul. 68–160, 1968–1 C.B. 167; Rev. Rul. 69–254, 1969–1 C.B. 129; Rev. Rul. 71–541, 1971–2 C.B. 209.

This case is one in which we respond to the substance of the transaction rather than its deceptive form; the relevant legislative history of the applicable statutory provisions, which has been already mentioned briefly, is therefore pertinent in order to ensure that our application of those provisions in this case comply with legislative intent.

The penalty provision of section 72(m)(5) was prescribed to prevent abuse of the statute and frustration of its purpose of providing a means of retirement to self-employed persons. The purpose of that provision, and also of the further penalty provision of section 401(d)(5)(C) which is respondent's second issue in this case, was clearly indicated in the legislation's committee reports, which state in pertinent part as follows:

### M. PREMATURE DISTRIBUTIONS

These penalties are imposed in order to prevent retirement plans from, in effect, becoming income-averaging plans under which deductible contributions would be made to the plan in high-income, high-tax years and the assets would be drawn down in low-income or loss years when little or no tax would be due. It is the purpose of this bill to provide means for financing retirement; these penalties are designed to insure that retirement plans will not be used for other purposes. [S. Rept. No. 992, 87th Cong., 1st Sess. (1961), 1962–3 C.B. 324. See also H. Rept. No. 378, 87th Cong., 1st Sess. (1961), 1962–3 C.B. 273.]

It is obvious that petitioner's case is not even remotely within the prohibitory intendment of the statute. We do not see how our holding for petitioner in this case will subvert the policy therein described. We feel petitioner's actions were entirely consistent with the fair application of the rules that Congress has set down in providing for the establishment of tax-deferred retirement plans for self-employed persons as interpreted by the respondent's regulations.

The resolution of the issue presented must therefore hinge on the effect of the bank's error, in light of the otherwise proper actions taken by petitioner. It is obvious from the facts that not only were petitioner's directive actions prior to the bank's error completely within the proper procedures to avoid a premature distribution, but petitioner's subsequent actions, following the bank's error, were themselves entirely consistent with his prior intent and directions. Petitioner's endorsing the check and forwarding it on to the successor retirement plan were merely corrective actions that were necessary to carry out his prior instructions to First National. Petitioner took no action that was contrary to the ultimate fulfillment of his initial course of action, an admittedly proper course of action that would have itself, had it been properly carried out, resulted in no premature distribution.

The facts before us disclose a failure by First National to carry out petitioner's request, in violation of its own duties under the custodial

agreement, coupled with nothing more than legitimate corrective action on the part of petitioner to remedy that error, all in accordance with petitioner's design to change his plan within his retirement program. Respondent insists that petitioner's action amounted to a termination of the FIF plan and a request for a distribution from First National to him. The record before us does not support that conclusion.

We are not constrained to permit the bank's mistake to control the issue, especially in light of the immediate corrective action taken by petitioner. We are not unaware that taxpayers must observe care and caution when planning their transactions along the frequently narrow path through the maze of tax laws; however, neither are we insensitive to the plight of a taxpayer who has taken a course of action in planning his affairs only to be thwarted by a third-party error in effectuating those plans.[8]

Of course, we do not imply that where error, either on the part of the taxpayer or on the part of a third party and acquiesced in by the taxpayer, affects the substantive result of a transaction, that the taxpayer may escape the effects of the real substance of his resulting position. However, petitioner's case involves no such alteration of petitioner's substantive position. In fact, petitioner here took immediate corrective action so as to *insure* that there would be no diversion from his original request to have the funds forwarded to his successor retirement plan.

Respondent points out that as of May 13, 1966, the date of the mailing of the check to petitioner by First National, New England Merchants had not officially executed an "acceptance" of its appointment as custodian of petitioner's successor retirement plan. Without this acceptance, respondent questions the actual existence of a qualifying plan to which the funds could have been directly transferred on that date. In this light, it is argued that the intended transfer falls short

---

[8] This Court has previously noted that an error committed by a third party contrary to the express desires of a taxpayer should not necessarily control the tax effects of the taxpayer's resulting position. In *Estate of Bert L. Fuchs,* 47 T.C. 199 (1966), pursuant to the funding of a partnership cross purchase death buyout agreement, an insurance agent erroneously issued accidental death insurance policies in the names of the respective insured partners as the owners thereof. This was contrary to the express request of the partners involved to have the beneficiary of each policy the owner thereof. In dealing with the effect of the insurance agent's error in technically giving the decedent-insured "ownership," within the meaning of sec. 2042, of certain of the policies, we stated the following:

"The instant case comes within the exception mentioned in *United States* v. *Rhode Island Hospital Trust Co.,* 355 F. 2d 7 (C.A. 1, 1966),[5] to the rule articulated therein, to wit:

'To the principle of the heavy predominance of the "policy facts" over the "intent facts" there must be added the caveat that, where the insurance contract itself does not reflect the instructions of the parties, as where an agent, on his own initiative, inserts a reservation of right to change a beneficiary contrary to the intentions which had been expressed to him, no incidents of ownership are thereby created. National Metropolitan Bank of Washington v. United States (1950), 87 F. Supp. 773, 115 Ct. Cl. 396; Schongalla v. Hickey, 2 Cir. 1945, 149 F. 2d 687. [Footnote omitted.] [*Estate of Bert L. Fuchs, supra* at 205.]'"

of indications in the above-cited rulings which require that the funds must be transferred from one qualifying plan to another qualifying plan. However, it is also true that petitioner had already executed the agreements to create the new plan on March 24, 1966, and the successor plan was in fact accepted on May 26, 1966, apparently in the normal course of the processing of such applications. Further, the effective date of the plan was designated as March 24, 1966, so that there was actually continuity of coverage between the original and the successor plans. It should be mentioned that even if New England Merchants had actually accepted appointment as custodian prior to May 13, 1966, it would merely have meant that New England Merchants could not then have refused to accept petitioner's investment with Keystone; petitioner, himself, would have had no greater obligation imposed on him to turn the money over to Keystone.

Respondent finally contends that since petitioner requested that the funds be sent directly to Keystone as the investment funding medium, rather than to New England Merchants as the custodian, the terms of the successor custodian provision of the FIF plan were not followed by petitioner. We do not regard this particular provision as the exclusive method of transferring funds from one plan to another plan; we cannot read this requirement as controlling. The shares of Keystone were purchased and issued completely in accordance with the custodial concept, as indicated by the Keystone share purchase confirmation designating the account as follows:

New England Merchants Natl. Bank
Cust. of Animal Clinic
Profit Sharing Retirement Plan
U/A Dated 3/24/66
A/C Keith L. Doing
2060 Fairground Rd.
Casper, Wyo. 92601

As the payment to Keystone was made under a qualifying custodial plan, the transfer from one "plan" to another "plan" was properly completed.

For the above reasons, we conclude and hold that petitioner did not receive a premature distribution within the meaning of section 72 (m) (5) (A) (i), and, therefore, respondent's assertion of a deficiency based on the imposition of tax under section 72 (m) (5) (C) was erroneous.

*Issue 2. Disallowance of Deduction for Contribution to Self-Employment Retirement Plan*

As we have held that petitioner did not receive a premature distribution within the meaning of section 72 (m) (5) (A) (i), the limitations

prescribed by section 401(d)(5)(C)[9] are therefore not invoked. Accordingly, respondent was in error in disallowing petitioner's deduction based on contributions paid to his self-employment retirement plan in 1967, and respondent's assertion of a deficiency based thereon must therefore be rejected.

*Decision will be entered for the petitioners.*

---

[9] SEC. 401. QUALIFIED PENSION, PROFIT-SHARING, AND STOCK BONUS PLANS.

(d) ADDITIONAL REQUIREMENTS FOR QUALIFICATION OF TRUSTS AND PLANS BENEFITING OWNER-EMPLOYEES.—A trust forming part of a pension or profit-sharing plan which provides contributions or benefits for employees some or all of whom are owner-employees shall constitute a qualified trust under this section only if, in addition to meeting the requirements of subsection (a), the following requirements of this subsection are met by the trust and by the plan of which such trust is a part:

\*       \*       \*       \*       \*       \*       \*

(5) The plan does not permit—

\*       \*       \*       \*       \*       \*       \*

(C) if a distribution under the plan is made to any employee and if any portion of such distribution is an amount described in section 72(m)(5)(A)(i), contributions to be made on behalf of such employee for the 5 taxable years succeeding the taxable year in which such distribution is made.