H. DALE GUNTHER AND MARIE M. GUNTHER, GENE W. GUNTHER AND LOIS H. GUNTHER, JAMES L. BJORKMAN AND PENELOPE A. BJORKMAN, PETER C. GUNTHER AND MARY LOU GUNTHER, DONALD S. ROBINSON AND PAMELA G. ROBINSON, PRUDENCE G. HILLIER, AND GARY B. GUNTHER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 11115-84.          Filed January 19, 1989.

*James M. Neis, Thomas P. Fitzgerald,* and *Susan Cisle,* for the petitioners.
*Warren P. Simonsen,* for the respondent.

CHABOT, *Judge:*\* Respondent determined deficiencies in Federal individual income tax against petitioners for 1981 as follows:

---

\*By Order of the Chief Judge, this case has been reassigned to Judge Herbert L. Chabot for opinion and decision.

| Petitioners | Deficiency |
|---|---|
| H. Dale Gunther and Marie M. Gunther .............. | $185,019 |
| Gene W. Gunther and Lois H. Gunther ............... | 185,353 |
| James L. Bjorkman and Penelope A. Bjorkman ........ | 1,200 |
| Peter C. Gunther and Mary Lou Gunther ............. | 1,372 |
| Donald S. Robinson and Pamela G. Robinson ......... | 1,609 |
| Prudence G. Hillier................................. | 651 |
| Gary B. Gunther.................................... | 4,479 |

After concessions by respondent,[1] the issue for decision is whether an exchange of stock held by petitioners in Galesburg Builders Supply Co. (hereinafter sometimes referred to as Builders) for stock and corporate debentures in Gunther Construction Co. (hereinafter sometimes referred to as Construction) is a transaction governed by sections 304, 302, and 301 or by section 351.

## FINDINGS OF FACT

Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference.

When the joint petition was filed in the instant case, all the petitioners resided in Galesburg, Illinois.

Petitioners H. Dale Gunther (hereinafter sometimes referred to as Dale) and Gene W. Gunther (hereinafter sometimes referred to as Gene) are brothers.[2] Penelope A. Bjorkman, Peter C. Gunther, Pamela G. Robinson, and Prudence G. Hillier are Dale's children. Gary B. Gunther and Linda Gunther are Gene's children. Although Linda Gunther was also involved as a participant in the transaction in issue, she is not a petitioner in the instant case. (Dale, Dale's children, Gene, and Gene's children are hereinafter sometimes referred to collectively as the Gunthers.)

Both Construction and Builders are Delaware corporations; each has its office and principal place of business at Galesburg, Illinois. Since about 1920, Construction or its

---

[1]At trial, respondent conceded that the corporate debentures received by petitioners are not "boot" for purposes of sec. 351 and further that the provisions of sec. 453 do not apply.

Unless indicated otherwise, all section, subchapter, and chapter references are to sections, subchapters, and chapters of the Internal Revenue Code of 1954 as in effect for the year in issue.

[2]Petitioners Dale and Marie M. Gunther; Gene and Lois H. Gunther; James L. Bjorkman and Penelope A. Bjorkman; Peter C. Gunther and Mary Lou Gunther; and Donald S. Robinson and Pamela G. Robinson are each husband and wife, respectively.

predecessor has been engaged in the highway and heavy construction business, while Builders or its predecessor has been engaged in the building supply business. Construction, which generally operates within a 60-mile radius of Galesburg, does both asphalt paving and concrete construction. Builders' principal product is ready-mixed concrete.

At all relevant times, Construction's directors were Gene, Dale, Lois H. Gunther, and Marie M. Gunther. At all relevant times, Construction's officers were as follows:

President . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Gene
Vice president . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Dale
Secretary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Peter C. Gunther
Treasurer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Gene
Assistant secretary/controller . . . . . . . . . . . . . . . . . . . . . Robert T. Fulton

Robert T. Fulton (hereinafter sometimes referred to as Fulton), Construction's chief financial officer, is unrelated to the Gunthers and has never owned any stock in Construction or Builders.

About 25 percent (and sometimes as much as 40 percent) of Construction's revenues were attributable to projects that required quality ready-mixed concrete. Builders was Construction's sole source of quality ready-mixed concrete. If Construction did not have a ready and dependable supplier of quality ready-mixed concrete, then Construction would have been precluded from successfully bidding on projects requiring the use of concrete. Not only would this have allowed competitors to perform the concrete portion of projects requiring both ready-mixed concrete and asphalt, but in Fulton's opinion would have put Construction at a competitive disadvantage when bidding against asphalt paving contractors.

During 1981, Construction was Builders' largest customer, accounting for about 15 percent of Builders' revenues.

Late in the summer of 1980, Dale, Gene, and Fulton met to discuss the financial condition of both Construction and Builders. At that time, Builders was losing money. The three of them concluded that Builders' economic viability was threatened by declining sales and diminishing profit margins resulting from the rapid deterioration of the Galesburg economy as well as from increased competition.

To ensure Builders' survival, to assure Construction of a reliable source of quality ready-mixed concrete, and to facilitate working capital infusions, Dale, Gene, and Fulton determined that it would be in the best interests of both companies to reorganize the companies and make Builders a wholly owned subsidiary of Construction.

In December 1980, Fulton, on behalf of Construction, engaged Construction's independent auditors and tax consultants, Peat, Marwick, Mitchell & Co. (hereinafter sometimes referred to as PMM) to determine the structure and to implement the proposed reorganization. Fulton had been employed in PMM's audit division at their Peoria and Galesburg, Illinois, offices for 5 years before joining Construction; he participated in the meetings with PMM. James D. Stuckey of PMM recommended to Fulton that Builders' shareholders transfer their Builders stock to Construction in exchange for stock and debentures in Construction. PMM advised Fulton that such an exchange was tax free under section 351.

Before January 2, 1981, the outstanding stock in Builders was held as shown in table 1.[3]

Table 1

| Individual | Number of shares | Type of stock | Percentage ownership |
|---|---|---|---|
| Dale | 650.0000 | Common | 50 |
| Gene | 650.0000 | Common | 50 |
| Gary B. Gunther | 13.4275 | Class A preferred | 25 |
| | 18.5725 | Class B preferred | 25 |
| Linda Gunther | 13.4275 | Class A preferred | 25 |
| | 18.5725 | Class B preferred | 25 |
| Pamela G. Robinson | 6.71375 | Class A preferred | 12.5 |
| | 9.28625 | Class B preferred | 12.5 |
| Penelope A. Bjorkman | 6.71375 | Class A preferred | 12.5 |
| | 9.28625 | Class B preferred | 12.5 |
| Peter C. Gunther | 6.71375 | Class A preferred | 12.5 |
| | 9.28625 | Class B preferred | 12.5 |
| Prudence G. Hillier | 6.71375 | Class A preferred | 12.5 |
| | 9.28625 | Class B preferred | 12.5 |

---

[3]On Jan. 2, 1981, Builders stock was a capital asset held for more than 1 year in the hands of each Builders shareholder. The aggregate bases of Builders stock held by petitioners immediately before the transfer on Jan. 2, 1981, were as follows:

| | |
|---|---|
| Class A preferred | $5,371 |
| Class B preferred | 7,429 |
| Common | 130,000 |

Before January 2, 1981, the outstanding stock in Construction was held as shown in table 2.

Table 2

| Individual | Number of shares | Type of stock | Percentage ownership |
|---|---|---|---|
| Dale | 738.0000 | Common | 50 |
| Gene | 738.0000 | Common | 50 |
| Gary B. Gunther | 13.4275 | Class A preferred | 25 |
| | 11.1425 | Class B preferred | 25 |
| Linda Gunther | 13.4275 | Class A preferred | 25 |
| | 11.1425 | Class B preferred | 25 |
| Pamela G. Robinson | 6.71375 | Class A preferred | 12.5 |
| | 5.57125 | Class B preferred | 12.5 |
| Penelope A. Bjorkman | 6.71375 | Class A preferred | 12.5 |
| | 5.57125 | Class B preferred | 12.5 |
| Peter C. Gunther | 6.71375 | Class A preferred | 12.5 |
| | 5.57125 | Class B preferred | 12.5 |
| Prudence G. Hillier | 6.71375 | Class A preferred | 12.5 |
| | 5.57125 | Class B preferred | 12.5 |

Only the owners of the common stock of Builders and Construction had voting rights. The Class A and Class B preferred stock of each corporation were nonvoting.

On January 2, 1981, Construction had earnings and profits of more than $569,000, and Builders had earnings and profits of $527,998. On that date, Builders' shareholders exchanged all of their Builders stock for the amounts and classes of Construction stock shown in table 3.

Table 3

| Individual | Number of shares | Type of stock |
|---|---|---|
| Dale | 12.0000 | Common |
| Gene | 12.0000 | Common |
| Gary B. Gunther | 13.4275 | Class A preferred |
| | .5000 | Class B preferred |
| Linda Gunther | 13.4275 | Class A preferred |
| | .5000 | Class B preferred |
| Pamela G. Robinson | 6.71375 | Class A preferred |
| | .25000 | Class B preferred |
| Penelope A. Bjorkman | 6.71375 | Class A preferred |
| | .25000 | Class B preferred |
| Peter C. Gunther | 6.71375 | Class A preferred |
| | .25000 | Class B preferred |
| Prudence G. Hillier | 6.71375 | Class A preferred |
| | .25000 | Class B preferred |

In addition to the above stock, Builders' shareholders also received, in exchange for all of their Builders stock, 17-percent debentures issued by Construction due 11 years and 1 day from the date of issuance, January 2, 1981.[4] The debentures were issued in the face amounts shown in table 4.

Table 4

| Individual | Amount of debenture |
|---|---|
| Dale | $270,000 |
| Gene | 270,000 |
| Gary B. Gunther | 7,250 |
| Linda Gunther | 7,250 |
| Pamela G. Robinson | 3,625 |
| Penelope A. Bjorkman | 3,625 |
| Peter C. Gunther | 3,625 |
| Prudence G. Hillier | 3,625 |
| | [5]569,000 |

No other property or cash was distributed to Builders' shareholders. No liabilities were transferred to Construction by any transferor. After the transfer on January 2, 1981, the outstanding stock in Construction was held as shown in table 5.

Table 5

| Individual | Number of shares | Type of stock | Percentage ownership |
|---|---|---|---|
| Dale | 750.0000 | Common | 50 |
| Gene | 750.0000 | Common | 50 |
| Gary B. Gunther | 26.8550 | Class A preferred | 25 |
| | 11.6425 | Class B preferred | 25 |
| Linda Gunther | 26.8550 | Class A preferred | 25 |
| | 11.6425 | Class B preferred | 25 |
| Pamela G. Robinson | 13.42750 | Class A preferred | 12.5 |
| | 5.82125 | Class B preferred | 12.5 |
| Penelope A. Bjorkman | 13.42750 | Class A preferred | 12.5 |
| | 5.82125 | Class B preferred | 12.5 |
| Peter C. Gunther | 13.42750 | Class A preferred | 12.5 |
| | 5.82125 | Class B preferred | 12.5 |
| Prudence G. Hillier | 13.42750 | Class A preferred | 12.5 |
| | 5.82125 | Class B preferred | 12.5 |

[4]In order to determine the exchange ratio, Fulton prepared a "workup" of the supposed book value of both Builders and Construction as of Dec. 31, 1980. Once the preferred shareholders had been given an equivalent value of stock and debentures, 24 shares of Construction common stock (which were authorized but unissued) were then issued, with the balance allocated to the debentures.

[5]The aggregate net fair market value of these debentures on Jan. 2, 1981, was $398,300.

At the time of the transaction on January 2, 1981, Construction and Builders intended to continue operating their respective businesses in the same manner in which the businesses were conducted before the date the transaction was contemplated.

Petitioners did not report any gain or loss from the exchange of the Gunthers' stock in Builders for stock and debentures in Construction. Construction has paid the interest payments on the debentures to the Gunthers when due, and petitioners have reported the interest payments as taxable income in the year received.

---

The January 2, 1981, transaction was essentially equivalent to a dividend.

## OPINION

Respondent contends that the exchange of stock in Builders for stock and debentures in Construction was a redemption through the use of a related corporation under section 304, and that the face amount of the debentures was essentially equivalent to a dividend under section 302. Accordingly, respondent determined that the debentures that Construction distributed to the Gunthers constituted dividends in the face amounts of the debentures, as shown in table 6.

### Table 6

| Petitioners | Amounts |
|---|---|
| H. Dale Gunther and Marie M. Gunther | $270,000 |
| Gene W. and Lois H. Gunther | 270,000 |
| James L. Bjorkman and Penelope A. Bjorkman | 3,625 |
| Peter C. Gunther and Mary Lou Gunther | 3,625 |
| Donald S. Robinson and Pamela G. Robinson | 3,625 |
| Prudence G. Hillier | 3,625 |
| Gary B. Gunther | 7,250 |

Petitioners contend that the exchange of stock, for stock and debentures, was tax free under section 351. In making this assertion, petitioners contend that existing case law, the legislative history of sections 304 and 351, and general principles of statutory construction show that when a

transaction falls within both sections 304, 302, and 301 (on the one hand), and section 351 (on the other hand), then section 351 overrides sections 304, 302, and 301.

We agree with petitioners.

Section 304[6] provides that, under certain circumstances, the purported sale of a taxpayer's stock to a corporation that the taxpayer controls is to be treated as a distribution

---

[6]Sec. 304 provides, in pertinent part, as follows:

SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

(a) TREATMENT OF CERTAIN STOCK PURCHASES.—

(1) ACQUISITION BY RELATED CORPORATION (OTHER THAN SUBSIDIARY).—For purposes of sections 302 and 303, if—

(A) one or more persons are in control of each of two corporations, and

(B) in return for property, one of the corporations acquires stock in the other corporation from the person (or persons) so in control,

then (unless paragraph (2) applies) such property shall be treated as a distribution in redemption of the stock of the corporation acquiring such stock. In any such case, the stock so acquired shall be treated as having been transferred by the person from whom acquired, and as having been received by the corporation acquiring it, as a contribution to the capital of such corporation.

\*     \*     \*     \*     \*     \*     \*

(b) SPECIAL RULES FOR APPLICATION OF SUBSECTION (a).—

(1) RULE FOR DETERMINATIONS UNDER SECTION 302(b).—In the case of any acquisition of stock to which subsection (a) of this section applies, determinations as to whether the acquisition is, by reason of section 302(b), to be treated as a distribution in part or full payment in exchange for the stock shall be made by reference to the stock of the issuing corporation. In applying section 318(a) (relating to constructive ownership of stock) with respect to section 302(b) for purposes of this paragraph, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein.

(2) AMOUNT CONSTITUTING DIVIDEND.—

(A) WHERE SUBSECTION (a)(1) APPLIES.—In the case of any acquisition of stock to which paragraph (1) (and not paragraph (2)) of subsection (a) of this section applies, the determination of the amount which is a dividend shall be made solely by reference to the earnings and profits of the acquiring corporation.

\*     \*     \*     \*     \*     \*     \*

(c) CONTROL.—

(1) IN GENERAL.—For purposes of this section, control means the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. If a person (or persons) is in control (within the meaning of the preceding sentence) of a corporation which in turn owns at least 50 percent of the total combined voting power of all stock entitled to vote of another corporation, or owns at least 50 percent of the total value of the shares of all classes of stock of another corporation, then such person (or persons) shall be treated as in control of such other corporation.

(2) CONSTRUCTIVE OWNERSHIP.—Section 318(a) (relating to the constructive ownership of stock) shall apply for purposes of determining control under paragraph (1). For purposes of the preceding sentence, sections 318(a)(2)(C) and 318(a)(3)(C) shall be applied without regard to the 50 percent limitation contained therein.

[The subsequent amendments of this provision (by sec. 1875(b) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2894; by secs. 712(l)(1), 712(l)(2), 712(l)(3), 712(l)(4), 712(l)(5)(A), and 712(l)(7)(B) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 953-955; and by secs. 226(a)(1)(A), 226(a)(2), and 226(a)(3) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 490-492) do not apply to the instant case.]

in redemption of the acquiring corporation's stock. In order for section 304 to require this result, both of two conditions must be present. Firstly, one or more persons must have been in "control" of each of the two corporations. Sec. 304(a)(1)(A). Secondly, one of the corporations, in exchange for property, must have acquired stock in the other corporation from the person so in control. Sec. 304(a)(1)(B).

"Control" is defined in section 304(c)(1) as the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock. Section 304(c)(2) expressly provides that the section 318(a)[7] attribution rules relating to the constructive ownership of stock apply in determining whether control is present.

With respect to both Construction and Builders, Gene and Dale each owned 50 percent of the common voting stock, while the remaining shareholders, all of whom were the children of either Gene or Dale, are considered to own by attribution the 50-percent stock interest owned by their

---

[7]Sec. 318(a) provides, in pertinent part, as follows:

SEC. 318. CONSTRUCTIVE OWNERSHIP OF STOCK.

(a) GENERAL RULE.—For purposes of those provisions of this subchapter to which the rules contained in this section are expressly made applicable—

(1) MEMBERS OF FAMILY.—

(A) IN GENERAL—An individual shall be considered as owning the stock owned, directly or indirectly, by or for—

\* \* \* \* \* \* \*

(ii) his children, grandchildren, and parents.

\* \* \* \* \* \* \*

(2) ATTRIBUTION FROM PARTNERSHIPS, ESTATES, TRUSTS, AND CORPORATIONS.—

\* \* \* \* \* \* \*

(C) FROM CORPORATIONS—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such person shall be considered as owning the stock owned, directly or indirectly, by or for such corporation, in that proportion which the value of the stock which such person so owns bears to the value of all the stock in such corporation.

(3) ATTRIBUTION TO PARTNERSHIPS, ESTATES, TRUSTS, AND CORPORATIONS.—

\* \* \* \* \* \* \*

(C) To CORPORATIONS—If 50 percent or more in value of the stock in a corporation is owned, directly or indirectly, by or for any person, such corporation shall be considered as owning the stock owned, directly or indirectly, by or for such person.

\* \* \* \* \* \* \*

(5) OPERATING RULES.—

(A) IN GENERAL.—Except as provided in subparagraphs (B) and (C), stock constructively owned by a person by reason of the application of paragraph (1), (2), (3), or (4), shall, for purposes of applying paragraphs (1), (2), and (4), be considered as actually owned by such person.

respective fathers. Sec. 318(a)(1)(A)(ii). Similarly, Gene and Dale are considered to own by attribution the stock owned by their respective children. Sec. 318(a)(1)(A)(ii). Because the Gunthers had control of both Construction and Builders, we conclude that the first condition, as set forth in section 304(a)(1)(A), has been satisfied.

We also conclude that the second condition, as set forth in section 304(a)(1)(B), has been satisfied. That section requires that, in exchange for "property",[8] one of the corporations acquire stock in the other corporation from the person so in control. In the instant case, Construction, in exchange for property (debentures), acquired the stock of Builders from the Gunthers, the persons in control of both corporations.

The tax consequences of a section 304(a)(1) redemption are governed by section 302.[9] Section 302(a) provides that if a

---

[8]Sec. 317(a) provides as follows:

SEC. 317. OTHER DEFINITIONS.

(a) PROPERTY.—For purposes of this part [i.e., part I, secs. 301-318], the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

[9]Sec. 302 provides, in pertinent part, as follows:

SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), or (3) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(1) REDEMPTIONS NOT EQUIVALENT TO DIVIDENDS.—Subsection (a) shall apply if the redemption is not essentially equivalent to a dividend.

(2) SUBSTANTIALLY DISPROPORTIONATE REDEMPTION OF STOCK.—

(A) IN GENERAL.—Subsection (a) shall apply if the distribution is substantially disproportionate with respect to the shareholder.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

(4) APPLICATION OF PARAGRAPHS.—In determining whether a redemption meets the requirements of paragraph (1), the fact that such redemption fails to meet the requirements of paragraph (2) or (3) shall not be taken into account. If a redemption meets the requirements of paragraph (3) and also the requirements of paragraph (1) or (2), then so much of subsection (c)(2) as would (but for this sentence) apply in respect of the acquisition of an interest in the corporation within the 10-year period beginning on the date of the distribution shall not apply.

(c) CONSTRUCTIVE OWNERSHIP OF STOCK.—

(1) IN GENERAL.—Except as provided in paragraph (2) of this subsection, section 318(a) shall apply in determining the ownership of stock for purposes of this section.

\*　　\*　　\*　　\*　　\*　　\*　　\*

(d) REDEMPTIONS TREATED AS DISTRIBUTIONS OF PROPERTY.—Except as otherwise provided in this subchapter [i.e., subchapter C, secs. 301-385 (sec. 386 having been added in 1984)], if a corporation redeems its stock (within the meaning of section 317(b)), and if subsection (a) of

redemption of stock meets any of the tests provided in section 302(b), the redemption shall be treated as a distribution in exchange for stock. If none of the tests of section 302(b) is met, then section 302(d) applies to treat the redemption as a distribution under section 301.[10] Under section 301, the distribution is to be treated as ordinary income to the extent of the distributing corporation's earnings and profits. (Sec. 301(c); sec. 316(a).[11])

Under section 302(a), a redemption is treated as a distribution in exchange for stock where: (1) It is not essentially equivalent to a dividend (sec. 302(b)(1)); (2) the distribution is substantially disproportionate with respect to the shareholder (sec. 302(b)(2)); or (3) the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder (sec. 302(b)(3))... In applying section 302(b), section 304(b)(1) provides that reference is to be made to each shareholder's ownership of the stock in the issuing corporation, in this case Builders, and that the attribution rules of section 318 apply.[12] Sec. 302(c); sec. 304(b)(1).

---

this section does not apply, such redemption shall be treated as a distribution of property to which section 301 applies.

[The subsequent amendments of this provision (by secs. 222(c)(1), 222(c)(3), and 222(c)(4) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 324, 478-479) do not apply to the instant case.]

[10]Sec. 301 provides, in pertinent part, as follows:

SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter [i.e., ch. 1, secs. 1-1399], a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

*　　*　　*　　*　　*　　*　　*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(l) AMOUNT CONSTITUTING DIVIDEND —That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

[11]SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE —For purposes of this subtitle [i.e., subtitle A, secs. 1-1564], the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which sec. 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

[12]Under sec. 318(a)(1), the family attribution rules, the shares held by an individual may be attributed directly or indirectly as being owned by that person's spouse, children, grandchildren, and parents. With respect to corporations, sec. 318(a)(2)(C) provides that if at least 50

Section 302(b)(1) applies to a redemption if it "is not essentially equivalent to a dividend." As we recently stated, in *Cerone v. Commissioner,* 87 T.C. 1, 18 (1986) —

in *United States v. Davis,* 397 U.S. 301 (1970) * * * , the Supreme Court held that: (1) The constructive ownership rules of section 318 apply to dividend equivalency determinations under section 302(b)(1); (2) redemptions of stock held by a sole shareholder, including a "constructive" sole shareholder, are always essentially equivalent to a dividend under section 302(b)(1); (3) business purpose is irrelevant in determining dividend equivalency under section 302(b)(1); and (4) in order to avoid dividend equivalency, the redemption must result in a "meaningful reduction" in the shareholder's proportionate interest in the corporation.

In the instant case, before the redemption, each of the shareholders owned directly or through attribution 50 percent of Builders voting stock. Pursuant to section 318(a)(1), Dale's 50-percent common voting stock interest in Builders is attributed to each of Dale's children, and Gene's 50-percent common voting stock interest in Builders is attributed to each of Gene's children. After the redemption, the same shareholders through attribution continued to own 50 percent of Builders' voting stock. Construction actually owned 100 percent of Builders common voting stock. Dale and Gene each actually owned 50 percent of Construction common voting stock. Pursuant to sections 304(b)(1) and 318(a)(2)(C), one-half of Construction's 100-percent ownership interest in Builders voting stock is attributed to Dale and the other half to Gene. Pursuant to sections 318(a)(1) and 318(a)(5)(A), Dale's and Gene's 50-percent constructive ownership interests in Builders are reattributed to each of their respective children. Both before and after the redemption, the same shareholders, actually or constructively, owned 50 percent of Builders voting stock. Thus, each shareholder retained the same amount of control over Builders. No one shareholder obtained control over Builders following the redemption. The parity of control between the shareholders remained the same. There was no meaningful reduction in

percent of the value of the stock in a corporation is owned directly or indirectly by or for any person, that person is considered to own a proportionate interest of all of the outstanding stock of the corporation. A special rule in sec. 304(b)(1) provides that the 50-percent ownership restriction on attribution under sec. 318(a)(2)(C) is not applicable in cases to which sec. 304 applies. In addition to the above attribution rules, the children would be treated as owning their parents' stock in Builders by virtue of sec. 318(a)(5)(A), which reattributes the parents' attributed ownership under sec. 318(a)(2)(C) in Builders to the children.

any shareholder's interest. We conclude that the redemption is essentially equivalent to a dividend under section 302(b)(1). See *Estate of Schneider v. Commissioner*, 88 T.C. 906, 943-944 (1987), affd. 855 F.2d 435 (7th Cir. 1988); *Niedermeyer v. Commissioner*, 62 T.C. 280 (1974), affd. 535 F.2d 500 (9th Cir. 1976).

The instant case does not come within either of the specific "safe harbor" provisions of paragraphs (2) and (3) of section 302(b). Section 302(b)(2) requires, inter alia, that the shareholder own less than 50 percent of the total combined voting power of all classes of stock entitled to vote. Section 302(b)(3) requires a complete redemption of all the stock owned by the shareholder. As previously discussed, each shareholder constructively owned 50 percent of Builders stock after the redemption. Consequently, we conclude that the redemption does not meet the requirements of either paragraph (2) or paragraph (3) of section 302(b).[13]

Because the redemption of stock in this case does not come within the provisions of any of the paragraphs of section 302(b), section 302(d) treats the redemption as a distribution of property to ·which section 301 applies. Section 301(c)(1) provides that "That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income." Under section 301(b)(1)(A), the amount of any distribution to a noncorporate shareholder is equal to the amount of money received, plus the fair market value of other property received. Section 316 in turn defines a dividend as any distribution of property made by a corporation to its shareholders from current or accumulated earnings and profits. See note 11, *supra*. Section 304(b)(2)(A) states that the determination of the amount which is a dividend is made by reference to the earnings and profits of the acquiring corporation (which in the instant case is Construction). The parties have stipulated, and we have

[13]Sec. 302(c)(2) provides that, under certain circumstances, the family attribution rules of paragraph (l) of sec. 318(a) can be waived in determining if a shareholder has completely terminated his or her interest under sec. 302(b)(3). Sec. 302(c)(2) does not provide for a waiver of any of the other attribution rules of sec. 318(a). Hence, even if family attribution under sec. 318(a)(1) were waived in the instant case, sec. 302(b)(3) would not be satisfied because, pursuant to the corporate attribution rules of sec. 318(a)(2)(C) and 304(b)(1), Construction's ownership of Builders stock is attributed to each of the Gunthers in proportion to the value of the stock that individual owns in Construction; this attribution prevents any of the Gunthers from satisfying the complete redemption requirements of sec. 302(b)(3).

found, that Construction's earnings and profits exceeded $569,000 at the time of the transfer, and the fair market value of the debentures at the time of their issuance totaled $398,300. Thus, respondent's position is that the combined operations of sections 301, 302, 304, 316, and 318 call for dividend treatment with respect to the debentures that the Gunthers received from Construction.[14]

Petitioners, however, assert that the exchange of Builders stock for stock and debentures in Construction is governed by section 351 and further argue that the Congress did not intend for section 304 to apply to transactions also falling within section 351.

Section 351(a) provides that no gain or loss shall be recognized if (1) property is transferred to a corporation by one or more persons solely in exchange for stock or securities in that corporation and (2) immediately after the exchange the transferors of the property are in control of the corporation.[15] For purposes of section 351, "control" means ownership of stock possessing at least 80 percent of the combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation. Sec. 351(a); sec. 368(c).[16] In the instant case, one or more persons (the Gunthers) transferred property (Builders stock) to a con-

---

[14]On opening brief, respondent contends that the notices of deficiency are correct in that the Gunthers are to be charged with an aggregate of $569,000 of dividends. See tables 4 and 6, *supra*. Petitioners point out on answering brief (as they had in their petition) that, even if the Gunthers are to be charged with dividends, the correct amount would be only $398,300, the stipulated aggregate fair market value of the debentures. Under sec. 301(b)(1)(A), if the transaction is treated as a distribution, then the aggregate amount of the distribution is the fair market value of the debentures— $398,300. *Rose Ann Coates Trust v. Commissioner*, 55 T.C. 501, 514 (1970), affd. 480 F.2d 468, 474 (9th Cir. 1973); see B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 7.40 (5th ed. 1987).

[15]Sec. 351(a) provides as follows:

SEC. 351. TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.

(a) GENERAL RULE.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control (as defined in section 368(c)) of the corporation.

[16]SEC. 368. DEFINITIONS RELATING TO CORPORATE REORGANIZATIONS.

(c) CONTROL.—For purposes of part I (other than section 304), part II, this part, and part V, the term "control" means the ownership of stock possessing at least 80 percent of the total combined voting power of all classes of stock entitled to vote and at least 80 percent of the total number of shares of all other classes of stock of the corporation.

[The subsequent amendments of this provision (by sec. 1804(h)(1) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2806-2807; and by sec. 64(a) of the Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 584) do not apply to the instant case.]

trolled corporation (Construction) solely in exchange for stock and securities (11-year debentures) in the controlled corporation. Where there is more than one transferor of property, as was the case here, the transaction will qualify under section 351 if the transferors as a group are in control of the corporation immediately after the exchange. Accordingly, we conclude that the transaction before us here also falls within the parameters of section 351.[17]

This brings us to the issue of whether the literal language of section 351 operates to preclude dividend treatment under section 301. Petitioners, relying on the legislative history of section 351, emphasize that the predecessor of section 351 originated in the Revenue Act of 1921 for the express purpose of permitting business to go forward with the readjustments required by existing business conditions. Cf. S. Rept. 67-274, at 11-12 (1921), 1939-1 C.B. (Part 2) 181, 187. They contend that the Gunthers have done nothing more than change the form of their investment in Builders. Further, petitioners argue that the "except" clauses in sections 302(d) (note 9, *supra*) and 301(a) (note 10, *supra*) recognize that other sections, such as section 351, may limit what otherwise might be characterized as dividends. Further, petitioners urge us to follow the holding in *Haserot v. Commissioner,* 41 T.C. 562 (1964) (hereinafter sometimes referred to as *Haserot I*), remanded 355 F.2d 200 (6th Cir. 1965), decision reviewed and reissued 46 T.C. 864 (1966) (hereinafter sometimes referred to as *Haserot II*), affd. sub nom. *Commissioner v. Stickney,* 399 F.2d 828 (6th Cir. 1968), and thus find that section 351 governs where the transaction falls literally within the provisions of both sections 304 and 351.

On answering brief, respondent states that he "does not refute petitioners' contention that the exchange of BUILD-ERS stock for CONSTRUCTION stock is nontaxable under section 351." Respondent maintains, however, that the

---

[17]Neither side argued the issue of whether the debentures were properly characterized as securities for purposes of sec. 351, but in any event, we conclude that they so qualify. See *D'Angelo Associates, Inc. v. Commissioner,* 70 T.C. 121, 134 (1978), citing *Camp Wolters Enterprises, Inc. v. Commissioner,* 22 T.C. 737 (1954), affd. 230 F.2d 555 (5th Cir. 1956); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, par. 3.03[2] (5th ed. 1987) (notes with a 5-year term or less rarely qualify as "securities," while a term of 10 years or more ordinarily is sufficient to bring them within sec. 351(a)). Respondent conceded that the debentures are not "boot" for purposes of sec. 351. See note 1, *supra.*

Gunthers went beyond the purpose of section 351 by having Construction issue debentures, an act which, respondent argues, brings petitioners "within the provisions of section 304." Respondent asserts that because section 304 is more specific with respect to bailouts, section 304 controls over section 351. In support of his argument, respondent alleges that although petitioners stated that the form of the Gunthers' business has not changed, in actuality petitioners avoided paying tax on $569,000 worth (see note 14, *supra*) of dividends. It is respondent's view that the Gunthers' purpose in the instant transaction was to: (1) Facilitate an infusion of capital into Builders by Construction; (2) transfer debt equal to earnings and profits to the shareholders; (3) obtain an interest deduction for future distributions; and (4) convert ordinary income into capital gains which is deferred for 11 years.

This Court considered the precise issue of whether section 351 takes precedence over dividend treatment under section 301 in *Haserot I* and *Haserot II*.[18] In *Haserot I*, we were confronted with the typical brother-sister redemption. The taxpayer owned actually and constructively (pursuant to sec. 318) more than 50 percent of the outstanding stock of two corporations, Northport and Gypsum. The taxpayer also owned directly more than 80 percent of the outstanding stock of another corporation, the Company. In accordance with a bona fide business purpose, the taxpayer transferred all of the stock of Northport and Gypsum to Company in exchange for 2,432 shares of authorized but unissued Company stock and $64,850 in cash. The transaction fell within the provisions of both sections 304 and 351. We agreed with the taxpayer that section 351 took precedence over dividend treatment under section 301, thus causing the payment received to be treated as a payment in exchange for stock, giving rise to capital gains treatment.

Because we determined that section 351 controlled the transaction, we did not address in *Haserot I* the issue of

---

[18]Since our decision in *Haserot I*, we have not had occasion to directly address the conflict between sec. 304 and 351. In *Rose Ann Coates Trust v. Commissioner*, 55 T.C. at 512, affd. on other grounds 480 F.2d at 472, 473, we held that sec. 351 was inapplicable to a transaction that was otherwise governed by sec. 304 because the taxpayers-transferors did not receive stock or securities in exchange for property, as required by sec. 351(a). Similarly, in *Brams v. Commissioner*, T.C. Memo. 1983-25, affd. 734 F.2d 290, 292-293 (6th Cir. 1984), the taxpayer did not satisfy the 80-percent-control requirement of sec. 351.

dividend equivalence under section 302(b)(1). On appeal, the Court of Appeals for the Sixth Circuit remanded for a determination as to whether the transaction was essentially equivalent to a dividend, within the meaning of section 302(b)(1). 355 F.2d at 200, 201. On remand, in *Haserot II,* we held that the distribution of cash to the taxpayer was essentially equivalent to a dividend under section 302(b)(1), but, in light of the limited mandate on remand, we did not reconsider our prior opinion as to the applicability of dividend treatment under section 301. 46 T.C. at 872. Thus, notwithstanding our holding of dividend equivalence on remand, we did not alter our earlier decision for the taxpayer.

However, Judge Tannenwald,[19] speaking separately, believed that the issue of whether section 351 operated to preclude dividend treatment under section 301 warranted reconsideration. After concluding that section 304 applies to sales as well as exchanges, and that section 304 does not require that an acquisition be solely for property in order for that section to apply, Judge Tannenwald took issue with the taxpayer's assertion that, because of the phrase "except as otherwise provided" in sections 302(d) and 301(a), section 351 rather than 301 controlled. Judge Tannenwald concluded as follows (46 T.C. at 877-878):

> Doubtless the statute would have been clearer if Congress had directly connected the "except" clauses by placing them immediately after the phrases "such redemption" and "a distribution." Nevertheless, I believe that the "except" clauses of sections 302(d) and 301(a) relate to the terms "redemption" and "distribution" in the respective subsections and are therefore limited to the provisions dealing with such situations. Such reasoning allows the permissiveness of section 351 to yield to the preventive policy of section 304. * * * It best achieves the underlying legislative intent and policy and, in my opinion, more nearly reflects the manner in which Congress would have "straightened this ruck out if they had come across it." * * *

In reaching the above conclusion, Judge Tannenwald emphasized that the Senate, which added the "except" language to the statute, was still primarily concerned with

---

[19]Judge Train wrote the opinion in *Haserot I;* he had resigned from this Court by the time the Court of Appeals remanded the case. 44 T.C. III. Whereupon, the case was reassigned to Judge Tannenwald. Judge Tannenwald wrote the unanimous opinion of the Court in *Haserot II* (46 T.C. 864), and also wrote a separate opinion (46 T.C. at 872-878), in which he was joined by Judge Simpson.

avoidance devices which had proved successful under the Internal Revenue Code of 1939, and that the transfer of stock of brother-sister corporations was one such device with which the Congress was concerned. A holding that section 351 controlled, in Judge Tannenwald's view, would invite the mischief which sections 304, 302, and 301 were intended to prevent because the extraction of corporate earnings at capital gains rates would be available to an 80-percent or greater shareholder but not to a 50 to 79-percent shareholder. Accordingly, Judge Tannenwald opined that a judicially created safe harbor from section 304 was contrary to the statute which explicitly applies to all shareholders controlling 50 percent or more of a corporation. *Haserot II*, 46 T.C. at 877-878.

The Court of Appeals for the Sixth Circuit, to which *Haserot II* was appealed, affirmed without dissent the Tax Court's opinion in *Haserot I* and disagreed with Judge Tannenwald's contention that sections 304, 302, and 301 controlled over section 351. *Commissioner v. Stickney*, 399 F.2d 828 (6th Cir. 1968). After noting that the applicability of section 304 is determined by "laboring through a labyrinth of related sections" and is not self-executing, the Court of Appeals emphasized that section 304 must be read in pari materia with related sections, particularly with section 301. Because section 301 contains "except as otherwise provided" language, the Court of Appeals concluded that section 301 mandated a finding that section 351 controlled. 399 F.2d at 834. The Court of Appeals also determined that control was not the sole criteria in determining the applicable section, but rather because the application of section 304 "is limited to sales," section 351 which "by its express provisions extends its application to exchanges," must therefore apply to the exchange in issue.

In affirming *Haserot II*, the Court of Appeals adopted Judge Train's analysis in *Haserot I* (41 T.C. at 570) and concluded its opinion as follows (399 F.2d at 834-835):

> Particularly able arguments were heard in this case, and counsel stopped just short of agreeing that Commissioner was contending his construction of statutes to be correct because that was what Congress should have said. If our logic seems to support that contention it is sufficient to respond that Congress did not say it, but did utter the

clearly applicable language enacted as Section 351. Had Congress intended the Section 304(a) treatment to apply to such situations as the present one that end could have been accomplished by a specific affirmative enactment, or by a negation of 351 application.

In the original opinion of the Tax Court, Judge Train stated:

"We have no reason to believe that Congress has any intent with regard to the fact pattern in this case. However, the statements in sections 301(a) and 302(d), 'except as otherwise provided in this chapter' [or subchapter] of the Code, indicate that Congress made the policy decision that dividend treatment will result from the application of Section 302 only if no other provision in the relevant parts of the Code requires other treatment. Section 351 has no such limitation. That section is, by its terms, applicable. That section provides for tax treatment of the payment in question in a manner other than and different from the distribution treatment provided for by sections 302(d) and 301. Consequently, the very words in the latter sections preclude dividend treatment in this case."

We are in accord with this determination, and accordingly affirm the decision of the Tax Court.

Five years later, the conflict between sections 304, 302, and 301 (on the one hand) and section 351 (on the other hand) was considered by the Court of Appeals for the Ninth Circuit in *Rose Ann Coates Trust v. Commissioner,* 480 F.2d 468 (9th Cir. 1973), affg. 55 T.C. 501 (1970). In that case, the shareholders of WIP transferred their stock interest in WIP to CAM for a promise to pay a specific amount of cash plus interest in installments over a 10-year period. A few days after CAM acquired the WIP stock, CAM dissolved WIP, acquired WIP's assets, and assumed WIP's liabilities. The taxpayers reported the transaction as a sale of their WIP stock, with their gain taxable at capital gains rates. The Commissioner treated the transaction as a redemption by a related corporation under section 304(a)(1) and, pursuant to sections 302(d) and 301, the value of the installment contract (see note 14, *supra*) was treated as a distribution taxable as a dividend.

This Court did not reach the issue of whether section 351 controlled over sections 304, 302, and 301 because we concluded that the installment sales contract was not a "security" within the meaning of section 351. However, the Court of Appeals chose to address the overlap between those sections. The Court of Appeals stated (480 F.2d at 472) that "even assuming *arguendo* that these agreements

are 'securities' under §351, we are convinced that the provisions of §351 are overridden by those of §304 and that, accordingly, §304 and not §351 applies to this transaction. *See* Henry McK. Haserot, 46 T.C. 864, 872 (1966), (Tannenwald, J.) (separate opinion)."

The conflict between the Court of Appeals for the Sixth Circuit and the Tax Court (on the one hand) and the Court of Appeals for the Ninth Circuit (on the other hand) has been resolved by section 226(a)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248, 96 Stat. 490. This legislation, effective for transfers occurring after August 31, 1982, in taxable years ending after that date, changes the statutory coordination of sections 304, 302, and 301, and 351 so that, in situations such as that presented in the instant case, section 351 would not apply. This change was part of a revision of sections 304 and 306, with modifications relating to debt-financed acquisitions by operating corporations, changes as to which a corporation's earnings and profits are looked to in determining dividend status, modifications as to which shareholders are taken into account in determining common control, and exceptions for bank holding companies. The Joint Statement of Managers explains the revisions in some detail (H. Rept. 97-760 (Conf.) 541-543 (1982), 1982-2 C.B. 635-636).

Although the Congress has now spoken on this issue, the taxable year involved in the instant case is 1981, before the effective date of the 1982 Act amendments. In the 15 years since the Court of Appeals' *Coates Trust* opinion, neither this Court nor, apparently, any Court of Appeals, has addressed the question. Respondent urges us in the instant case to reconsider the issue of which section controls here for pre-1982 Act cases. Petitioners, on the other hand, argue that even if they have "found a hole in the dike," the proper remedy was the statutory provision enacted in TEFRA and not a decision by this Court in favor of respondent.

We have reconsidered the matter. We conclude that *Haserot I,* as affirmed by the Court of Appeals for the Sixth Circuit, was correct and we will not overrule our opinion therein.

The instant case is one of many in which several statutory provisions apparently apply to a single set of facts, and the different statutory provisions lead to different bottom lines. In such situations, we must act as "traffic cop", and determine which of the provisions is to take precedence or how the provisions may be harmonized.

Sometimes, it becomes apparent that the Congress was aware of the problem and provided a clear, unambiguous rule to govern our traffic-cop activities. This was the situation in, for example, *Pallottini v. Commissioner*, 90 T.C. 498 (1988), where the Congress' traffic-cop rule was expressed by way of repealing one of the two conflicting statutory provisions. In *Watt v. Alaska*, 451 U.S. 259 (1981), the Supreme Court was faced with conflicting statutes enacted more than 40 years apart. No statutory provision plainly directed which statute was to govern. The Supreme Court had to act as traffic cop and write its own rule because of the failure of the Congress to do so. The majority of the Supreme Court concluded that the statutes could best be harmonized by the later statute's giving way to the earlier one. In *Millsap v. Commissioner*, 91 T.C. 926 (1988), the majority concluded that we were faced with a similar situation and concluded that the earlier statute should give way to the later one.

In *Watt v. Alaska, supra*, and in *Millsap v. Commissioner, supra*, the Courts had to examine the policies that the Congress sought to further by each of the conflicting statutes and had to determine what traffic-cop rule would be likely to more faithfully serve what the courts thought to be the more important of the Congress' policies. The courts had to do so because the Congress failed to do so. In contrast, in *Pallottini*, the Congress plainly provided the rule and it was not for us to determine whether the Congress' policies could be better served by a different rule.

The instant case is more like *Pallottini* than it is like *Watt v. Alaska, supra*, and *Millsap*. In the instant case, it is clear that the literal language of section 351 provides one answer, while the literal language of sections 304, 302 (except the first phrase of subsection (d) thereof), and 301 (except the first phrase of subsection (a) thereof), provides a vastly different answer. Here, too, we must assume the role

of traffic cop, and determine what traffic-cop rule we should apply.

In *Pallottini v. Commissioner*, we stated as follows (90 T.C. at 502-503):

The lesson we take from both the majority and the dissenters in *Watt v. Alaska, supra*, is that, in order to resolve conflicts in enacted laws, we should first look to the texts of the statutes themselves. Recourse may then be had to congressional intent, as may be deduced from the legislative history, to resolve any uncertainties that may remain after we have examined the statutes. When we apply this lesson to the instant case, the answer is clear.

The statutory provisions we look to in the instant case set forth two traffic-cop rules. As we pointed out in *Haserot I*, the language of sections 302(d) and 301(a) precludes the application of section 301 in situations where any other sections in subchapter C are applicable; section 351 contains no such limitation. Consequently, the very words of sections 302(d) and 301(a) preclude dividend treatment when a transaction also falls within section 351. *Haserot I*, 41 T.C. at 570.

Thus, the instant case is not like *Watt v. Alaska, supra*, and *Millsap*, in which the courts had to create the traffic-cop rules. In the instant case, the rules are embedded in the statute itself. The Congress made the choice. Respondent simply does not like the choice that the Congress made. "Courts are not authorized to rewrite a statute because they might deem its effect susceptible of improvements." *Badaracco v. Commissioner*, 464 U.S. 386, 398 (1984). We will adhere to our decision in *Haserot I*. We conclude, under the facts of this case, that nonrecognition treatment under section 351 takes precedence over dividend treatment under section 301.

Respondent argues on answering brief that "petitioners went beyond the purpose of section 351 by issuing debentures, and this act clearly brings petitioners within the provisions of section 304. Thus, by petitioners [sic] own actions, they made the transaction taxable under section 304, and since section 304 is more specific with respect to bailouts than section 351, section 304 does control." Respondent has not favored us with any authority for his legal conclusion that section 351 does not contemplate issuance

of debentures. We conclude that section 351 clearly contemplates the issuance of debentures. The fact that debentures are issued may affect the taxability of the transaction under section 351 but does not automatically preclude that transaction from falling within section 351. See notes 1 & 17, *supra.*

Although respondent emphasized Congress' concern with eliminating the avoidance devices, he put forth no new arguments or references to legislative history that would cause us to depart from our previous determination that section 301 dividend treatments yields in situations where the broader language of section 351 also applies.

Respondent argues, as he did in *Haserot I,* that literal application of section 351 in the instant case leads to an absurd result contrary to the intent of the legislature because shareholders who own 80 percent or more of a corporation can avoid section 304 and bail out earnings and profits under section 351; while shareholders who own 50 to less than 80 percent of a corporation would be subject to section 304 and would be unable to bail out earnings and profits. In reaching our decision in *Haserot I,* we acknowledged this concern and stated as follows (41 T.C. at 570):

We recognize that this interpretation of the Code implies that brother-sister corporation redemptions may be so arranged that they continue to be subject to special scrutiny and possible dividend treatment only if the controlling party has less than 80-percent control—that greater control (with concomitant greater power for mischief) may confer the benefits of capital gains treatment. Congress might have provided that sections 301, 302, and 304 controlled or at least had coordinate status with other provisions of subchapter C. It might have provided for dividend or ordinary income treatment in the event of section 351 "boot." However, Congress chose to subordinate the dividend path of sections 302(d) and 301(a) to other provisions of the subchapter and, unlike the "boot" provisions of sections 356(a)(2), Congress chose to treat section 351(b) "boot" as a payment in exchange. [Fn. ref. omitted.]

Although there is no indication that the Congress focused on the *fact pattern* of the instant case or that of *Haserot,* it is clear that the Congress did focus on traffic-cop rules regarding the *Code sections* involved in the instant case.

H.R. 8300, the Internal Revenue Code of 1954, as reported by the Ways and Means Committee on March 9, 1954, did not include the "except as otherwise provided"

language that ultimately appears in sections 301(a) and 302(d). Instead, the Ways and Means version of section 301(a) provided that section 301(a) is "subject to the provisions of section 302 (relating to redemption of stock) and section 306 (relating to distributions of securities and property)." Section 301(d) provided a cross-reference to section 353 for "special rules relating to distributions received from inactive corporations." Section 302(b) provided that "To the extent that a distribution of property by a corporation to a shareholder in redemption of participating or nonparticipating stock is not within subsection (a), it shall be treated as a distribution of property as provided in section 301." Section 302(d) provided the same cross-reference to section 353 as did section 301(d). Section 304(a) directed the reader to section 302(a)(4) in the case of redemption and section 301 in the case of distributions. Finally, section 351(c)(4) of the Ways and Means bill provided as follows:

> (4) In the case of the receipt of property in connection with an exchange under this section which has the effect of the distribution of property under section 301, see such section.

The House of Representatives passed the bill on March 18, 1954, without changing any of the foregoing provisions.

Thus, under the House bill, sections 301, 302, and 304 would give way only to certain enumerated other provisions. Also, under the House bill, section 351 would give way to section 301 in situations such as those we face in the instant case and that we faced in *Haserot*.

On June 18, 1954, the Finance Committee reported amendments to H.R. 8300, which made the following changes to the foregoing provisions:

> (1) Section 301(a)'s references to sections 302 and 306 were replaced by "Except as otherwise provided in this chapter". Section 301(d)'s cross reference to section 353 was replaced by section 301(f)(3)'s special rule as follows:
> (3) For distribution in corporate organizations and reorganizations, see part III (sec. 351 and following).
> (2) Section 302(b)'s language was replaced by the following:
> (d) Except as otherwise provided in this subchapter, if a corporation redeems its stock * * * such redemption shall be treated as a distribution of property to which section 301 applies.

Section 302(d)'s cross reference to section 353 was eliminated.

(3) Section 304(a) directed the reader to sections 302 and 303, instead of 302(a)(4) and 301.

(4) Section 351 no longer had any reference to section 301.

On July 2, 1954, the Senate passed H.R. 8300, with the foregoing Finance Committee revisions intact. The Conference Committee agreed to the Senate amendment (amendment No. 82) with some modifications that do not apply to any of the foregoing provisions. H. Rept. 83-2543 (Conf.) 8-11, 34-41 (1954). The provisions then were enacted in the form in which they were reported by the Conference Committee.

Thus, although the Congress probably did not consider the fact pattern now before us, the Congress did consider a set of traffic-cop rules that would have subordinated section 351 to section 301 and its possibilities of dividend treatment. The Congress specifically rejected that set of traffic-cop rules. Instead, the Congress wrote traffic-cop rules that plainly subordinate the section 301 dividend rules to other provisions "in this chapter", i.e., in chapter 1 (which plainly includes section 351).

As part of the Tax Equity and Fiscal Responsibility Act of 1982, the Congress modified the traffic-cop rules. This modification is set forth in the margin.[20] A comparison of

---

[20]Sec. 226(a)(1)(A) of Pub. L. 97-248, 96 Stat. 324, 490-491, provides as follows:

SEC. 226. AMENDMENTS RELATING TO BAILOUTS THROUGH USE OF HOLDING COMPANIES.

(a) AMENDMENTS TO SECTION 304.—

(1) COORDINATION OF SECTIONS 304 AND 351.—

(A) Subsection (b) of section 304 (relating to special rules for application of subsection (a)) is amended by adding at the end thereof the following new paragraph:

"(3) COORDINATION WITH SECTION 351.—

"(A) PROPERTY TREATED AS RECEIVED IN REDEMPTION.—Except as otherwise provided in this paragraph, subsection (a) (and not part III) [i.e., secs. 351-368] shall apply to any property received in a distribution described in subsection (a).

"(B) CERTAIN ASSUMPTIONS OF LIABILITY, ETC.—

"(i) IN GENERAL.—Subsection (a) shall not apply to any liability—

"(I) assumed by the acquiring corporation, or

"(II) to which the stock is subject, if such liability was incurred by the transferor to acquire the stock. For purposes of the preceding sentence, the term 'stock' means stock referred to in paragraph (l)(B) or (2)(A) of subsection (a).

"(ii) EXTENSION OF OBLIGATIONS, ETC.—For purposes of clause (i), an extension, renewal, or refinancing of a liability which meets the requirements of clause (i) shall be treated as meeting such requirements.

"(C) DISTRIBUTIONS INCIDENT TO FORMATION OF BANK HOLDING COMPANIES.—If—

"(i) pursuant to a plan, control of a bank is acquired and within 2 years after the date on which such control is acquired, stock constituting control of such bank is transferred to a BHC in connection with its formation,

what the Congress did, with the rule that Judge Tannenwald proposed in *Haserot II* (set forth *supra*, following footnote reference 19), and what respondent has proposed in his revenue rulings,[21] reveals that the Congress' revision is vastly different from the rewriting proposed in *Haserot II.*

The Congress' 1982 Act revision is far more limited than the earlier proposals. In addition, the Congress believed that it was necessary to exclude two detailed categories of situations from even the very narrow rule of new section 304(b)(3)(A). In the Deficit Reduction Act of 1984 (paragraphs (2), (3)(A), (3)(B), and (4) of section 712(1), Pub. L. 98-369, 98 Stat. 494, 953), the Congress further fine-tuned the carefully limited 1982 Act modifications of the traffic-cop rules.

The Congress has the constitutional responsibility and institutional capability to bring to bear conflicting views of proper tax policy, as well as conflicting views of pragmatic politics and practical administrability. We have neither the constitutional responsibility nor the institutional capability.

We must fill in gaps in the statute or resolve conflicts between provisions when the statute does not provide the answer, if it is necessary to do so in order to resolve the case before us. We should not revise the statute, when the statute does provide the answer, merely because we believe we could have done a better job.

In its unanimous opinion in *Crooks v. Harrelson,* 282 U.S. 55, 60 (1930), the Supreme Court gave us the following advice as to tax statues:

---

"(ii) incident to the formation of the BHC there is a distribution of property described in subsection (a), and

"(iii) the shareholders of the BHC who receive distributions of such property do not have control of such BHC,

then, subsection (a) shall not apply to any securities received by a qualified minority shareholder incident to the formation of such BHC.

"(D) DEFINITIONS AND SPECIAL RULE.—For purposes of subparagraph (C) and this subparagraph—

"(i) QUALIFIED MINORITY SHAREHOLDER.—The term 'qualified minority shareholder' means any shareholder who owns less than 10 percent (in value) of the stock of the BHC. For purposes of the preceding sentence, the rules of paragraph (3) of subsection (c) shall apply.

"(ii) BHC.—The term 'BHC' means a bank holding company (within the meaning of section 2(a) of the Bank Holding Company act of 1956).

"(iii) SPECIAL RULE IN CASE OF BHC'S FORMED BEFORE 1985.—In the case of a BHC which is formed before 1985, clause (i) of subparagraph (C) shall not apply."

[21] Rev. Rul. 73-2, 1973-1 C.B. 171. See also Rev. Rul. 78-422, 1978-2 C.B. 129.

Courts have sometimes exercised a high degree of ingenuity in the effort to find justification for wrenching from the words of a statute a meaning which literally they did not bear in order to escape consequences thought to be absurd or to entail great hardship. But an application of the principle so nearly approaches the boundary between the exercise of the judicial power and that of the legislative power as to call rather for great caution and circumspection in order to avoid usurpation of the latter. *Monson v. Chester,* 22 Pick. 385, 387. It is not enough merely that hard and objectionable or absurd consequences, which probably were not within the contemplation of the framers, are produced by an act of legislation. Laws enacted with good intention, when put to the test, frequently, and to the surprise of the law maker himself, turn out to be mischievous, absurd, or otherwise objectionable. But in such case the remedy lies with the law making authority, and not with the courts. See *In re Alma Spinning Company,* L.R. 16 Ch. Div. 681, 686; *King v. Commissioners,* 5 A. & E. 804, 816; *Abley v. Dale,* L.J. (1851) N.S. Pt. 2, Vol. 20, 233, 235. And see generally *Chung Fook v. White,* 264 U.S. 443, 445; *Commr. of Immigration v. Gottlieb,* 265 U.S. 310, 313.

More recently, the Supreme Court's almost-unanimous opinion in *Badaracco v. Commissioner,* 464 U.S. at 398, told us the following about tax statutes:

The cases before us, however, concern the construction of existing statutes. The relevant question is not whether, as an abstract matter, the rule advocated by petitioners accords with good policy. The question we must consider is whether the policy petitioners favor is that which Congress effectuated by its enactment of §6501. Courts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement. See *TVA v. Hill,* 437 U.S. 153, 194-195 (1978).  * * *

In both *Harrelson* and *Badaracco,* the Supreme Court rejected taxpayers' pleas for "interpretations" that would straighten out perceived "rucks" in the texture of the statute. In the instant case, we reject respondent's call for such judicial repairs. The Congress has straightened out the ruck; as the 1982 Act's text shows, it did so with evident awareness of problems that had not been presented to this Court and it did so prospectively only.

Accordingly, because petitioners' exchange of stock in Builders for stock and securities in Construction is governed by section 351, we hold that petitioners correctly reported no gain or loss on the exchange on their respective 1981 Federal income tax returns.

To reflect the foregoing,

*Decision will be entered for the petitioners.*

Reviewed by the Court.

NIMS, PARKER, WHITAKER, KÖRNER, SHIELDS, HAMBLEN, COHEN, SWIFT, WILLIAMS, WELLS, WHALEN, and COLVIN, *JJ.,* agree with the majority opinion.

---

PARR, *J.,* concurring: While I believe that the separate opinion of Judge Tannenwald in *Haserot II* and the dissenting opinion in this case are better reasoned and would reach a more appropriate result, I nevertheless concur in the result reached by the majority. If we were writing on a clean slate, I would have supported the opposite result. Petitioners, however, were entitled to rely on *Haserot I* which we published and the Court of Appeals for the Sixth Circuit affirmed more than 24 years ago. Additionally, Congress has generally resolved this issue in section 226(a)(1) of the Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. 97-248.

GERBER and WILLIAMS, *JJ.,* agree with this concurring opinion.

---

WRIGHT, *J.,* dissenting: The majority upholds our decision in *Haserot v. Commissioner,* 41 T.C. 562 (1964) (*Haserot I*), and maintains that congressional intent is best served by holding that when both section 351 and section 304 apply, section 351 should control. I respectfully dissent. I agree with the separate opinion of Judge Tannenwald in *Haserot II,* and I believe that *Haserot I* was wrongly decided when written and that we should not uphold it now.

The majority compares the role of a "traffic cop" at an intersection to our task as a court because we both must direct the paths of two conflicting forces. While the majority quite correctly notes that occasionally the Court must decide between apparently conflicting statutory directives, the majority is mistaken in thinking that our "traffic-

cop" role permits only one solution. The majority states that here we have been given a "clear, unambiguous rule to govern our traffic-cop activities" (majority opinion at 59) as if we patrolled an intersection where only one light was green at a time. Unfortunately, if I may extend the majority's analogy, our "traffic-cop" is faced with green lights in both directions and the choice of which lane should take priority is far from clear.

The majority stresses that the legislative history of H.R. 8300, ultimately the Internal Revenue Act of 1954, contained directions for interpreting the overlap between section 351 and sections 301 and 302. The majority notes that the Senate Finance Committee amended the House bill but failed to discuss the relationship between sections 351 and 304. From this omission the majority draws the inference that Congress meant for section 351 to control when in conflict with section 304. However, the converse inference can just as easily be drawn. We conclude that Congress considered only the relationship between section 351 and sections 301 and 302 when enacting the amended legislation. Congress' silence on the interaction between sections 351 and 304 certainly should be read as an oversight and not as an expression of intent.

The majority's decision rests largely on its conclusion that the "literal language" of sections 304 and 351 allows no other result. However, an interpretation of "literal language" which leads to an absurd and irrational result should not be strictly followed. Rather than literally reading the statute to produce an absurd result, we should consider several possible interpretations of the statute, examine their effect, look to the legislative history, and adjudicate what interpretation carries out the legislative purpose. See *United States v. Gilmore,* 372 U.S. 39, 44-45 (1963); *Ziegler v. Commissioner,* 70 T.C. 139, 143 (1978); *Doing v. Commissioner,* 58 T.C. 115, 129 (1972). See also *J.C. Penney Co. v. Commissioner,* 37 T.C. 1013, 1017 (1962), affd. 312 F.2 655 (2d Cir. 1962) (in interpreting statutes, it is the Court's function to construe the language so as to give effect to the intent of Congress).

The legislative history of sections 351 and 304 demonstrates that section 304 of the 1954 Code was Congress'

response to the tax-avoidance possibilities inherent in sales of stock of one controlled corporation to another corporation controlled by the selling shareholders. S. Rept. 1622, 83d Cong., 2d Sess. 238-240 (1954). The genesis of section 304 can be found in section 208 of the Revenue Act of 1950, which added section 115(g) to the Internal Revenue Act of 1939, for the purpose of controlling redemptions by a subsidiary from a parent. In enacting this section, Congress intended to prevent the sale or exchange treatment in cases in which assets of a subsidiary are withdrawn from corporate solution in exchange for stock of its parent. See. H. Rept. 2319, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380, 420; S. Rept. 2375, 81st Cong., 2d Sess. (1950), 1950-2 C.B. 483.

After enactment of section 115(g), however, the same tax-avoidance possibilities, previously problematic in the parent-subsidiary situation, continued to arise in the brother-sister relationship, where both the issuing corporation and the acquiring corporation were controlled by the same interests. Recognizing this, one of the objectives of the draftsmen of the Internal Revenue Code of 1954 in creating section 304 was to prevent tax avoidance by "sales of stock between corporations owned by the same interests." S. Rept. 1622, *supra* at 45. Accordingly, the enactment in 1954 of section 304, which was designed to apply to brother-sister transactions as well as those between a parent and a subsidiary, precludes such abuses by characterizing the transaction for tax purposes so that the cash or other property received by the shareholders is not treated as the proceeds of a sale or exchange which would permit capital gains treatment. Specifically, section 304 fragments the transaction into two parts: (1) The stock which is transferred to the acquiring corporation is treated as a contribution to capital, and (2) the cash or other property received brings the transaction under the scrutiny of section 302. See generally *Kerr v. Commissioner,* 326 F.2d 225, 228-229 (9th Cir. 1964); *Wiseman v. United States,* 259 F. Supp. 90, 93-94 (D. Me. 1966), affd. per curiam 371 F.2d 816 (1st Cir. 1967); *Radnitz v. United States,* 187 F. Supp. 952 (S.D.N.Y. 1960), affd. per curiam 294 F.2d 577 (2d Cir. 1961); B. Bittker & J. Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 9.30-9.32 (5th ed. 1979).

The majority's interpretation of the interplay between sections 304 and 351 renders section 304 meaningless. Even though securities can normally be received without tax under section 351, the transfer to a controlled corporation of a related corporation's stock presents clear "bailout" opportunities because the corporation can later repay the securities without triggering dividend consequences to the holder. Secondly, the securities may be immediately marketable, raising problems analogous to the preferred stock bailouts which prompted the enactment of section 306. Further, if section 351 controlled the exchange for securities, a corporation could later retire the securities and, under section 1232, no dividend consequences would be triggered. Perhaps the most curious result of the majority's view is the special treatment unreasonably accorded to a particular group of shareholders. Under the majority's view, when both sections 351 and 304 apply, shareholders who own between 50 and 79 percent of a closely held corporation are prevented from bailing out corporate earnings by section 304, while shareholders with 80 percent or more would be protected from the anti-bailout sanction of section 304. Because the anti-bailout provision was clearly intended to reach all shareholders holding 50 percent or more of the outstanding stock, there is no sensible explanation for this absurd result.

While it appears that Congress did not provide for or contemplate the possible conflict between sections 351 and 304, one of the principal rules of statutory construction is that if an unreasonable result is produced by one of several interpretations of a statute, that is a reason for rejecting that interpretation in favor of another which would produce a reasonable result. *Rosado v. Wyman,* 397 U.S. 397 (1970); *Commissioner v. Brown,* 380 U.S. 563 (1965); *Worthy v. United States,* 328 F.2d 386 (5th Cir. 1964). The law favors a rational and sensible construction. *American Tobacco Co. v. Patterson,* 456 U.S. 63, 71 (1982). Thus, while the intention of the legislature must be ascertained from the words used to express it, the manifest reason and obvious purpose of the law should not be sacrificed to a literal interpretation of such words. *Harrison v. Northern Trust Co.,* 317 U.S. 476 (1943). To weave sections 304 and 351

together to produce a uniform and rational result, section 351 must give way in a situation which encapsulates the very problem which Congress sought to control by enacting section 304. As Judge Tannenwald noted in *Haserot II,* "Such reasoning allows the permissiveness of section 351 to yield to the preventive policy of section 304. * * * It best achieves the underlying legislative intent and policy and, in my opinion, more nearly reflects the manner in which Congress would have 'straightened this ruck out if they had come across it'." 47 T.C. at 877-878.

The majority's final point is that any decision other than theirs exceeds the bounds of our proper judicial activity. The finding that section 304 should control when sections 351 and 304 conflict, is apparently outside the bounds of statutory construction and "We should not revise the statute, when the statute does provide the answer, merely because we believe we could have done a better job." (Majority opinion at 64.) I submit to the majority that interpreting and clarifying unanticipated statutory conflict is the very business of a court and not an example of unjustifiable "judicial repairs."

Of perhaps greater significance, I would today overrule *Haserot v. Commissioner,* an old and established case. *Haserot v. Commisisoner* does not, however, represent a venerable and inviolate principle upon which tax planners have relied. Soon after *Haserot I* was issued, respondent issued a nonacquiescence in Rev. Rul. 73-2, 1973-1 C.B. 171. To extend the majority's analogy, our "traffic-cop" is placed at an intersection where there is not, and indeed has never been, any traffic. Moreover, the Ninth Circuit went out of its way to decline to follow *Haserot v. Commissioner,* and instead agreed with Judge Tannenwald's separate opinion. *Rose Ann Coates Trust v. Commissioner,* 480 F.2d 468 (9th Cir. 1973). To quote Justice Frankfurter "Wisdom often never comes, and so one ought not to reject it merely because it comes too late. Since I now realize that I should have joined the dissenters * * * , I shall not compound the error by pushing that decision still farther." *Henslee v. Union Planters National Bank,* 335 U.S. 595, 600 (1949). For the foregoing concerns, I respectfully dissent.

CLAPP, JACOBS, and RUWE, *JJ.,* agree with this dissent.